Quentin MERACLE and Nancy Meracle, Plaintiffs-Appellants,

v.

CHILDREN'S SERVICE SOCIETY OF WISCONSIN, a Wisconsin Corporation; and American Home Assurance Co., a foreign corporation, Defendants-Respondents-Petitioners,

ST. PAUL FIRE & MARINE INS. CO., a foreign corporation, Defendant.

Supreme Court

*No. 87-0457. Argued January 30, 1989.—Decided April 4, 1989.*

(Also reported in 437 N.W.2d 532.)

For the defendants-respondents-petitioners there were briefs by *Stephen P. Juech, Mary S. Ogorchock,* and *Frisch, Dudek and Slattery, Ltd.,* Milwaukee, and oral argument by *Mr. Juech.*

For the plaintiffs-appellants there was a brief by *Charles F. Stierman, Virginia M. Antoine,* and *Habush, Habush & Davis, S.C.,* Milwaukee, and oral argument by *Howard A. Davis.*

CALLOW, WILLIAM G., J.   This is a review of a decision of the court of appeals, *Meracle v. Children's Service Society of Wisconsin,* 143 Wis. 2d 476, 421 N.W.2d 856 (1988), reversing a judgment of the Milwaukee County Circuit Court, Judge Ralph Adam Fine, granting summary judgment in a wrongful adoption action to Children's Service Society of Wisconsin and American Home Assurance Company. The court of appeals decision also reversed the circuit court's denial of the motion of Quentin and Nancy Meracle for reconsideration of the judgment.

We address two issues in this case. First, is the cause of action of Quentin and Nancy Meracle (the Meracles) barred by the statute of limitations? Second, is the Meracles' cause of action barred by public policy? We conclude that the Meracles' claim for future, extraordinary medical expenses is not barred by either the statute of limitations or by public policy. We also hold, however, that the Meracles' claim for emotional distress must be dismissed because the alleged emotional distress was not manifested by physical injury.

In 1977, the Meracles contacted Children's Service Society of Wisconsin (CSS), an adoption agency, about adopting a child. They told CSS they wanted a "normal, healthy child," which they defined as a child without a "disabilitating" or terminal disease, who is not deformed and who is of average or above average intelligence.

On October 10, 1979, the Meracles met with Josephine Braden (Braden), a social worker at CSS, to

discuss the foster placement and adoption of Erin, a twenty-three month-old child. According to the Meracles' deposition testimony, Braden told them the following at the meeting: that Erin's paternal grandmother had died of Huntington's Disease; that Huntington's was a degenerative brain disease which is genetically transmitted between generations; that if one generation was free of the disease, the next generation would be free of it; that each child of a Huntington's Disease victim had a fifty-fifty chance of developing the disease; and that the disease was always fatal. According to the Meracles, Braden also told them that Erin's father, had tested negative for the disease and that, therefore, Erin had no more chance of developing the disease than did any other child.

In her deposition, Braden recalled discussing Huntington's Disease with the Meracles at this meeting. However, she did not recall telling the Meracles there was no chance of Erin developing the disease, and could not believe she had done so.

On October 18, 1979, CSS placed Erin with the Meracles, and on November 12, 1980, the adoption was completed.

On February 8, 1981, Nancy Meracle saw a segment of the television program *60 Minutes* which dealt with Huntington's Disease. The show stated that a child of a Huntington's Disease victim has a fifty percent chance of developing the disease. It also stated that there was no reliable test for someone at risk to determine whether he or she had inherited the disease.

"Alarmed" and "frightened," Nancy told her husband about the program. The Meracles obtained a pamphlet about Huntington's Disease from a library the next day which confirmed there was no test for the disease. They took no further action at this time.

On September 27, 1984, a neurologist diagnosed Erin as having Huntington's Disease. On September 25, 1985, the Meracles filed a complaint against CSS in the Milwaukee County Circuit Court. They subsequently amended the complaint twice to include two insurance companies as co-defendants: American Home Assurance Company (American Home) and St. Paul Fire & Marine Insurance Company.

The second amended complaint contained two claims for relief. First, the Meracles contended that CSS negligently placed Erin with them. Second, they contended that CSS negligently misrepresented to them that Erin's father was free of Huntington's Disease.[1] The Meracles demanded judgment of ten million dollars for each of the claims. They sought to recover damages for loss of society and companionship of Erin, emotional pain and suffering, interference with their enjoyment of life, lost wages and medical expenses.[2]

On September 8, 1986, CSS and American Home moved for summary judgment contending that the complaint was barred both by public policy and by the three-year statute of limitations. The Milwaukee County Circuit Court, Judge Ralph Adam Fine, on February 10, 1987, granted the motion for summary judgment holding that the claim was not brought within the three-year statute of limitations. In its memorandum decision the circuit court noted that a cause of action accrues when there is discovered negligence and a

---

[1]Although the Meracles' complaint included two claims for relief, they have treated the claims in their brief as a single claim based upon negligent misrepresentation.

[2]Before this court the parties have only disputed the recoverability of pecuniary damages, such as medical expenses, and damages for emotional pain and suffering. We, therefore, address only the recoverability of these damages in this case.

resulting known injury. It held that the cause of action in this case accrued in 1981 when the Meracles first discovered CSS's negligence. It concluded that the Meracles in 1981 had suffered both emotional distress and quantifiable pecuniary damages since probable medical expenses could be calculated at that time. On March 16, 1987, the circuit court issued an order denying the Meracles' motion for reconsideration.

The Meracles appealed from both the judgment and order on March 17, 1987. The court of appeals reversed. It held that the Meracles' complaint is actually composed of two separate claims. The first claim is for emotional distress based upon the Meracles' fears that Erin might contract Huntington's Disease. *Meracle,* 143 Wis. 2d at 481. The second claim is for future medical expenses and emotional distress the Meracles suffered by adopting a child who had actually developed the disease. *Id.* The court found that the first claim accrued in 1981 and thus was barred by the statute of limitations. *Id.* at 482. However, it held that the second claim did not accrue until Erin was diagnosed as having the disease in September of 1984. *Id.* at 483. It held that this claim was not time-barred and that it did not violate public policy. *Id.* at 483–84.

We first turn to CSS's contention that the Meracles' claim is barred by the three-year statute of limitations for negligence. CSS notes that *Borello v. U.S. Oil Co.,* 130 Wis. 2d 397, 411, 388 N.W.2d 140 (1986), set forth the following rule for when a cause of action accrues:

> [U]nder Wisconsin law, a cause of action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the injury was

probably caused by the defendant's conduct or product.

It insists that the Meracles' cause of action accrued in 1981 when the Meracles first learned of the negligent misrepresentation.

We find that in 1981, while the Meracles had learned of CSS's negligence, they had suffered no injury which would support a cause of action. As this court held in *Barry v. Minahan,* 127 Wis. 570, 573, 107 N.W. 488 (1906), "[a] cause of action accrues where there exists a claim capable of present enforcement, a suable party against whom it may be enforced, and a party who has a present right to enforce it." We defined "cause of action" similarly in *Holifield v. Setco Industries, Inc.,* 42 Wis. 2d 750, 754, 168 N.W.2d 177 (1969), stating "a person has a 'cause of action' when he can come into court, plead and prove certain facts and secure the relief requested." In 1981, the Meracles did not have a claim which they could have enforced in court either for pecuniary damages or for emotional distress.

We first consider the Meracles' ability to recover pecuniary damages. CSS contends that the Meracles could have stated a claim for the $1000 adoption fee and the cost of raising Erin between the time of her adoption and the discovery of the disease in 1981. This is incorrect. These are costs which would have been incurred in any case during the adoption of a child. The Meracles wanted to adopt a child. These were ordinary expenses pursuant to that end. It is only the extraordinary expenses, the unexpected expenses resulting from Erin's special needs, which are actionable.

CSS also contends that the Meracles could have stated a claim for Erin's future medical expenses in

1981. This also is incorrect. In order to sue for future medical expenses in 1981, while Erin had not yet contracted the disease, the Meracles would have had to base their claim on the mere possibility that Erin would develop the disease. To recover for future expenses due to an injury, a plaintiff must demonstrate that the anticipated expenses are reasonably certain to occur. "[R]ecovery may be had for *reasonably certain* injurious consequences of the tortfeasor's negligent conduct, not for merely *possible* injurious consequences." *Brantner v. Jenson,* 121 Wis. 2d 658, 663–64, 360 N.W.2d 529 (1985) (emphasis added).

This standard applies to the recovery of future medical expenses. In *Dumer v. St. Michael's Hospital,* 69 Wis. 2d 766, 776, 233 N.W.2d 372 (1975) (emphasis added), we held that the parents of a deformed child could recover in a wrongful birth action those expenses which they "will to a *reasonable medical certainty* suffer in the future" in providing medical attention for the child. Similarly, in *Bleyer v. Gross,* 19 Wis. 2d 305, 312, 120 N.W.2d 156 (1963), we allowed a husband to recover future medical expenses when his wife was injured in a car accident when medical testimony about future expenses "was not in terms of 'possibilities' but 'probabilities.'"

There was no reasonable medical certainty in 1981 that the Meracles would incur any future medical expenses because Erin had not developed Huntington's Disease. At the time, the Meracles only knew that Erin's paternal grandmother had developed the disease. They did not know whether her father would develop it. While Erin's father was not known to have developed the disease, there is a fifty percent chance that a Huntington's victim will genetically transmit the dis-

27

ease to his or her off-spring. The Meracles only knew that Erin's grandmother had the disease and her father had a fifty percent of developing Huntington's, and therefore Erin had only a twenty-five percent chance of developing the disease.

Further, Erin's chances of developing the disease within her first eighteen years, when the Meracles would have been responsible for medical payments, was even smaller. Deposition testimony revealed that only four to five percent of the people who develop Huntington's Disease do so while they are juveniles. In sum, even assuming that Erin would develop the disease at some point in her life, in 1981 there was only a four to five percent chance that the Meracles would incur future medical expenses for Erin. This risk constitutes a "mere possibility" and it was not an injury for which the Meracles could have recovered in 1981. They could not have shown with a reasonable medical certainty in 1981 that they would incur any future medical expenses. Thus, they did not suffer a pecuniary injury which would support a cause of action.

The Meracles likewise did not have a compensable claim for emotional distress in 1981. The general rule in Wisconsin is that, to recover for the negligent infliction of emotional distress, the "plaintiff's emotional distress must be manifested by physical injury." *Garrett v. City of New Berlin,* 122 Wis. 2d 223, 231, 362 N.W.2d 137 (1985). In *Garrett,* we held that hysteria is a physical injury which can form the basis of a claim for negligent infliction of emotional distress. *Id.* at 236. This rule exists because of the "fear of flooding the courts with fraudulent claims and exposing defendants to potentially unlimited liability for every type of mental disturbance." *La Fleur v. Mosher,* 109 Wis. 2d 112, 115,

325 N.W.2d 314 (1982). The existence of physical injury makes the genuineness of the claim much more likely.

CSS correctly points out that an exception to this rule exists. In *La Fleur,* we allowed a fourteen-year-old girl to recover damages for emotional distress when she was negligently confined in a police department cell for thirteen hours with no food, water or blankets. *Id.* at 122. We stated that, "under the unique facts presented in this case," the nature of the confinement itself guaranteed the genuineness of the claim. *Id.* at 118–19. We emphasized the fact that the tort involved "a substantial and unwarranted deprivation of liberty," which itself was "a sufficient guarantee that the claim is not frivolous." *Id.* at 120.

■

CSS contends that the Meracles' claim in 1981 was such that we should make another exception to the requirement that a claim for the negligent infliction of emotional distress be accompanied by physical injury. We disagree. *La Fleur* involved unique facts and the decision emphasized the narrowness of its holding. The Meracles were not deprived of liberty or any other constitutional right in 1981 nor does the nature of their claim present a similar guarantee of the genuineness and severity of the injury.

We find, therefore, that the Meracles suffered no injury, pecuniary or emotional, which would support a compensable claim in 1981.

■

The Meracles did suffer an injury which could form the basis for a cause of action in 1984 when they learned that Erin had developed Huntington's Disease. The Meracles had a cause of action for pecuniary damages at this time. They could then demonstrate with reasonable medical certainty that Erin would need extensive

future medical care. They were now certain to incur future expenses because of the adoption which they allege was induced by the affirmative misrepresentation that Erin's father had tested negative for the disease and therefore that Erin would not contract it. In 1984, the Meracles had "a claim capable of present enforcement." *Barry,* 127 Wis. at 573.

As in 1981, however, the Meracles could not maintain a claim for emotional distress in 1984. They still did not demonstrate the existence of any physical injury accompanying their claim. The distress that is usually experienced by close relatives when illness strikes a family member is normal and is not compensable. *See Waube v. Warrington,* 216 Wis. 603, 258 N.W. 497 (1935). The rule that a claim for the negligent infliction of emotional distress must be accompanied by physical injury is important and strikes "the appropriate balance between the rights of injured parties to obtain a remedy for a wrong, and the rights of defendants to be free from potentially unlimited liability and the meritless claims." *La Fleur,* 109 Wis. 2d at 118. The claim for emotional distress must be dismissed.

Under the discovery rule of *Borello,* 130 Wis. 2d at 411, the Meracles' cause of action for medical expenses accrued on September 27, 1984, when Erin was diagnosed with the disease. They filed their first complaint on September 25, 1985, well within the three-year limitations period. Therefore, their claim for future medical expenses is not time-barred and should be remanded for trial.

CSS also contends that, even if the Meracles' suit is not barred by the statute of limitations, it should be barred because it violates public policy. CSS, citing *Rieck,* notes that:

Even where the chain of causation is complete and direct, recovery may sometimes be denied on grounds of public policy because: (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden (in the case before us, upon physicians and obstetricians); or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

*Rieck v. Medical Protective Co.,* 64 Wis. 2d 514, 517–18, 219 N.W.2d 242 (1974).

In support of its position CSS cites two California decisions which discuss the policy implications of wrongful adoption actions. In *Richard P. v. Vista Del Mar Child Care Service,* 106 Cal. App. 3d 860, 165 Cal. Rptr. 370 (1980), the California Court of Appeals held that it would violate public policy to allow the adoptive parents of a child to sue an adoption agency which stated that the child, who later developed severe neurological damage, was healthy. The court feared that allowing such a suit to proceed would make adoption agencies the guarantors of the health of the children they place. In *Michael J. v. Los Angeles County Department of Adoptions,* 201 Cal. App. 3d 859, 247 Cal. Rptr. 504 (1988), the California Court of Appeals held that public policy did not bar a suit based on intentional misrepresentation by an adoption agency. However, the court reaffirmed its decision in *Richard P.,* that adoption agencies were not liable for negligence in placing adoptive children. *Michael J.,* 247 Cal. Rptr. at

513. CSS likewise contends that allowing this suit to proceed would place an unreasonable burden on adoption agencies, exposing them to potentially unlimited liability and making them guarantors of the health of the children they place.

Before determining whether we should bar this cause of action on public policy grounds, we feel it necessary to emphasize the uniqueness of this case. This is not a case in which an adoption agency placed a child without discovering and informing the prospective parents about the child's health problems. Therefore we need not and do not address the question of whether adoption agencies have a duty to discover and disclose health information about children they place for adoption. In this case, accepting the alleged facts as true for purposes of this summary judgment motion, CSS affirmatively misrepresented Erin's risk of developing Huntington's Disease. The agency assumed the duty of informing the Meracles about Huntington's Disease and about Erin's chances of developing the disease. Having voluntarily assumed this duty, the complaint alleges, CSS negligently breached it.

Given these unique circumstances, we hold that the Meracles' claim is not barred by public policy. Such a conclusion does not expose adoption agencies to potentially unlimited liability nor does it make such agencies guarantors of the health of adopted children. To avoid liability, agencies simply must refrain from making affirmative misrepresentations about a child's health. We do not hold that agencies have any duty to disclose health information. Further, our decision will not inhibit adoption. Indeed, it will give potential parents more confidence in the adoption process and in the accuracy of the information they receive. Such

confidence would be eroded if we were to immunize agencies from liability for false statements made during the adoption process.

We also emphasize that we do not create liability which is remote from or out of proportion to the negligence because, as we discussed above, we only allow recovery for the *extraordinary* medical expenses which will be incurred by the Meracles as a result of the negligent misrepresentation. This case is very different from *Rieck,* in which we determined based upon public policy that parents could not maintain a wrongful birth action to recover *ordinary* expenses of raising a normal child against a doctor who failed to diagnosis a pregnancy. *Rieck,* 64 Wis. 2d at 518-19. Finally, this decision does not open the way for fraudulent claims to be brought. There is no greater chance of fraud in a case like this than in any case in which the dispute centers over what words were spoken during a particular conversation. Based upon the unique factors in this case we conclude this suit is not barred by public policy.

We find, then, that this suit is not barred by the statute of limitations, or by public policy. We therefore affirm the decisions of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

HEFFERNAN, CHIEF JUSTICE (concurring). I concur only for the purpose of again stating my dissatisfaction with this court's continued adherence to *Waube v. Warrington,* 216 Wis. 603, 258 N.W. 497 (1935). We have tried to explain the *Waube* holding away in *Garrett v. City of New Berlin,* 122 Wis. 2d 223, 362 N.W.2d 137 (1985), and in *LaFleur v. Mosher,* 109 Wis. 2d 112, 325 N.W.2d 314 (1982). The results

reached in those cases were correct, but it should not have been necessary to have found reasons why the *Waube* rule was bad law if applied in those circumstances. It is bad law in any circumstance. As explained in my concurrence to *Garrett,* at 239 ff., *Waube* is in itself contrary to accepted Wisconsin tort jurisprudence. I repeat what I wrote then, at 242:

> It is time we dispense with the automatic and irrational application of the liability limiting formulations that the majority attempts to distinguish but at the same time fervently embraces.

I am authorized to state that Justice William A. Bablitch joins in this concurrence.