OPINION OF THE COURT
Beverly S. Cohen, J.
Plaintiffs Martin Juman and Phyllis Juman (the Jumans) move for an order (1) granting summary judgment on liability on their claim for wrongful adoption, and (2) setting this matter down for an inquest.
Defendant Louise Wise Services (the Agency) cross-moves for (1) an order granting summary judgment dismissing the complaint, on the ground that the action is barred by the Statute of Limitations (CPLR 213 [8]; 203 [g]); or (2) an order granting defendant partial summary judgment limiting plaintiffs’ compensable damages to pecuniary losses.
The Jumans’ complaint alleges a single cause of action for wrongful adoption. This court was the first in New York State to recognize a cause of action for wrongful adoption, characterizing it as "the extension of common-law fraud principles to the adoption setting”. (Juman v Wise Servs., 159 Misc 2d 314, 317, affd 211 AD2d 446 [1st Dept 1995].)
In 1964, Martin and Phyllis Juman applied to the Agency for an infant to adopt and to raise as their own. Throughout the years 1964 to 1966 the Jumans met and conversed with the defendant to this end. During an early discussion with the Agency, the Jumans talked about the child they would like to have. The conversation is reflected in the notes taken by the Agency’s caseworker: "We discussed the baby that they would like to have. They would take either a boy or girl, as long as it were healthy. The background isn’t terribly important, as long as the child is white * * * Mrs. J. feels that even if the father *51 was a criminal or something of this nature, it doesn’t mean the child will reflect these things at all, and they are pretty sure that environment is far more important than heredity.” (Exhibit C to cross motion, defendant’s supplemental response to plaintiffs’ interrogatories, hereinafter Supplemental Interrogatories, exhibit 10 thereto, note of Feb. 14, 1964.)
Prior to the time of the adoption in 1966, the Agency was familiar with the natural mother’s history of severe mental illness. At the time of her pregnancy with Michael Juman in 1964, the Agency knew that the natural mother had been hospitalized at Brooklyn State Hospital from age 18 to 21, and then again from age 28 to 36, a total of 11 years. They knew that she had had a prefrontal lobotomy in 1944. Following her discharge from Brooklyn State, she was living in a psychiatric aftercare facility called Fountain House for two or three years. The Agency had placed her first child for adoption, during one of her hospitalizations at Brooklyn State Hospital, prior to placing Michael with the Jumans.
According to defendant’s expert, the natural mother had been diagnosed in 1944 as having dementia praecox catatonic type, which is synonymous with schizophrenia. The Agency knew at the time of the adoption that the birth mother was treated for this condition with various therapies, which were ultimately unsuccessful, until 1944, when a prefrontal lobotomy was performed. Brooklyn State Hospital diagnosed her condition upon her second admission in 1955 as schizophrenia, hebephrenic type.
The Agency was also aware prior to the adoption that the natural father had been a psychiatric patient at Brooklyn State Hospital, who impregnated the natural mother when they were both at Fountain House.
However, at the time of the adoption the natural parents’ psychiatric history was omitted from the Agency’s disclosure to the adoptive parents. According to the caseworker’s notes, the Jumans were given the following information about the natural parents: "She won a scholarship to a well known college and finished two years of it. The mother had been going out with someone seriously, but he died suddenly of a heart attack and so she could not marry him. She became pregnant quite soon after. She said that if her boy friend had not died she would not have become pregnant. This shock led to some emotional difficulty and she later sought professional help for it. The baby’s father was white Jewish, but in character was not one of lasting quality. At this point the Js looked very *52 compassionate and. Mr. J said he could see that the replacement was for her loss. They were both very understanding of the whole history and did not have any questions outside Mr. J’s comment.” (Exhibit 10 to supplemental interrogatories, note of June 11, 1965.)
In 1965, the infant Michael was placed in the Jumans’ home and he was formally adopted by them in 1966. The birth certificate indicated that the baby’s name was Bruce Daybock, but the Jumans were told by the Agency that this name may have been made up by the birth mother, and might not have been her last name.
Subsequently, Michael suffered a number of serious psychological disorders beginning at the age of 16 or 17. He required intermittent hospitalization beginning in 1986. He was diagnosed as having various forms of mental illness including depression, manic depression, and schizophrenia. Ultimately, he committed suicide.
In 1985, Michael was being treated for depression by a Dr. Arthur Gross. Dr. Gross asked the Jumans to obtain information about Michael’s natural parents because he thought it might be helpful to Michael’s treatment. Mr. Juman wrote a letter asking the Agency to release any medical and health information it had about Michael to Dr. Gross.
The Agency replied with a letter dated November 11, 1985 addressed to Dr. Gross. It stated that Mr. Juman had requested the Agency to "forward any background information on Michael that might cast light on his current problems.” The Agency revealed the following health information about the natural parents: "the birth mother had a history of episodic depressions for which she was treated psychiatrically. She became involved with the birth father impulsively after the sudden death of her fiance. We have very little information about the birth father or his family.” The Agency added that: "I am sure that you realize that in 1965 we would have had much less concern about the possible organic nature of depression than we would have today.” No mention was made of the mother’s schizophrenia, her lengthy hospitalizations for that condition, her lobotomy, or the fact that the father had been in a psychiatric hospital.
The Jumans allege that they relied on the information provided by the Agency during the preadoption interviews as being the whole truth about the child’s medical background. They claim that they would not have made a positive decision to adopt Michael if the defendant had disclosed that the birth *53 mother suffered from schizophrenia and had had a frontal lobotomy.
Defendant asserts that it did not have an obligation to disclose the birth mother’s psychiatric history because it was not material. The Agency claims that at the time of the adoption members of the scientific community held differing opinions concerning whether schizophrenia was a disease that could be inherited. They present evidence that it was not until 1968 that "the literature suggested that there was sufficient evidence to postulate that there was a genetic component to the etiology of schizophrenia.” (Affidavit of Herman Spater, sworn to on Sept. 11,1996, hereinafter Spater Aff., ¶ 17.) The Agency’s expert states that from 1928 to 1966 there were 12 investigators who had conducted studies on identical twins, attempting to measure the incidence of schizophrenia in twin siblings who are genetically identical, but the results were inconclusive. (Ibid.) He goes on to say that in 1966, the year Michael was formally adopted, but after his placement in the Juman home, a study found that the incidence of schizophrenia in offspring of schizophrenic women given up for adoption or placed in foster homes was greater than the incidence of schizophrenia among offspring of nonschizophrenic mothers placed in foster homes. He states that this study was subject to criticism and debate.
THE STATUTE OF LIMITATIONS DEFENSE
Defendant has raised the issue of the timeliness of the Jumans’ claims as a bar to this action. As the court has characterized the claim for wrongful adoption as an extension of common-law fraud, plaintiffs’ claim would be barred if it was not brought within six years from the date of the fraud (CPLR 213 [8]) or two years from the time that the fraud was, or with reasonable diligence could have been, discovered (CPLR 203 [g]).* (See, K&E Trading & Shipping v Radmar Trading Corp., 174 AD2d 346.) As more than six years had passed between *54 Michael’s placement in 1965 and. when the complaint was served, on July 8, 1991, the suit is timely only if the Jumans first discovered or reasonably should have discovered the alleged fraud after July 8, 1989.
In 1990, Michael Juman tracked down a relative of his birth mother using the telephone book and records in the New York City Public Library. The relative disclosed the mother’s full psychiatric history to plaintiffs and their adopted son. The Jumans claim that this was when they first discovered the fraud.
The Agency claims that the Jumans knew earlier. They rely on the Jumans’ statements and records of Michael’s hospitalizations, which state that the natural mother suffered from manic depression and that Michael thought he had manic depressive disease that was of genetic origin. In addition, in a chronology prepared by the Jumans for their attorneys, it is stated that they learned from the Agency’s 1985 letter that the birth mother suffered from depression "and had been hospitalized.” (See, chronology, annexed as exhibit 12 to affidavit of Nancy Ledy-Gurren, sworn to on June 10, 1997.) The source of the information that the birth mother had been hospitalized for her condition is unclear because the letter does not mention hospitalization. The record reflects that Mr. Juman spoke to someone at the Agency after he received the letter.
However, information that the mother had manic depressive disease and was hospitalized for it does not constitute constructive discovery of the alleged fraud. In fact, the mother did not have manic depressive disease. The claim is that the Agency failed to disclose schizophrenia requiring long-term hospitalizations and a lobotomy. The statements in the records demonstrating that the Jumans thought that the birth mother had manic depressive disease merely bolster the Jumans’ claim that they believed that the Agency had told them the whole truth in the 1985 letter describing the mother as having episodes of depression, and stating that in 1965 the Agency was not as concerned about the organic nature of that illness.
The Agency also argues that the Jumans could have discovered the fraud earlier. First it is claimed that the Jumans should have searched for more information because the last name of the birth mother was on the birth certificate. Secondly, the Agency asserts that the 1985 letter should have led the Jumans to make a more complete search of the birth mother’s mental history. In effect, the Agency argues that their 1985 disclosure should have been viewed by the Jumans as suspicious enough to warrant further investigation and the investí *55 gation could have been conducted because the Jumans knew the birth mother’s last name.
" '[Although a plaintiff may not shut his eyes to facts which call for investigation, mere suspicion will not suffice as a ground for imputing knowledge of the fraud’ ”. (K&E Trading & Shipping v Radmar Trading Corp., 174 AD2d 346, 347, supra.) The Statute of Limitations will not bar an action unless it conclusively appears that the plaintiff had knowledge of facts from which the alleged fraud might be reasonably inferred. (Supra.)
Here, it cannot be said that it conclusively appears that the Jumans had facts from which the fraud could be inferred. Until 1985, when the Agency first told the Jumans that the mother had episodes of depression and implied that the depression was of an organic nature, the Jumans had no reason to suspect that anything had been concealed. In the 1985 letter, the Jumans were told that what had been concealed was manic depressive disease that could have been inherited by Michael. As Michael was thought at that time to be suffering from a form of depression, this would have appeared reasonable. It also would have appeared to be an elaboration of the disclosure by the Agency at the time of the adoption of the birth mother’s "emotional difficulty” following the shock caused by the death of her fiancé, for which she sought "professional help”.
If anything, the 1985 letter was a further concealment of the mother’s schizophrenia. This brings into play the rule that a party can be estopped from asserting the Statute of Limitations where it has taken steps to conceal the fraud or made affirmative misrepresentations to prevent its discovery within the statutory period. (Erbe v Lincoln Rochester Trust Co., 13 AD2d 211, 213-214.) This doctrine is equitable and derives from the principle that " 'no man may take advantage of his own wrong.’ ” (Supra, at 214.)
This is just such a case. To hold that the Jumans failed to make a reasonable investigation would be to require them to detect a deliberate falsehood and would reward the Agency for concealing the truth. The Jumans inquired of the Agency about the medical history of the birth mother at the suggestion of Michael’s psychiatrist. The Agency responded with a letter that concealed the mother’s schizophrenia. The letter purported to disclose all the information available, with a diagnosis for the birth mother that was consistent with Michael’s diagnosis in 1985, and with a claim that the mother suffered from an emotional difficulty that was more serious than that revealed *56 at the time of the adoption. However, the revelation that was finally to come in 1990 was far different from what was disclosed by the Agency in 1985.
The knowledge of the birth mother’s last name does not change the result. The Agency misled the Jumans in 1985 with a letter that purported to reveal all. Therefore, there was no duty to make inquiry utilizing the name. In addition, it is uncontradicted that the Jumans were told that the name might have been fictitious.
Therefore, the cross motion to dismiss the complaint on the ground of the Statute of Limitations is denied and the court dismisses the second affirmative defense contained in defendant’s answer.
PLAINTIFFS’ MOTION FOR SUMMARY JUDGMENT ON LIABILITY
In order to make out a prima facie case for fraud under New York law, a plaintiff must establish that: (1) defendant made a representation as to a material fact or concealed a material fact; (2) such representation was false and known by the defendant to be false, or was made recklessly; (3) defendant intended to deceive plaintiff and to induce the plaintiff to act upon the misrepresentation; (4) plaintiff justifiably relied upon the statement; and (5) as a result of such reliance plaintiff sustained injury. (Orbit Holding Corp. v Anthony Hotel Corp., 121 AD2d 311, 314; Lukowsky v Shalit, 110 AD2d 563, 568.)
Summary judgment is a drastic remedy and should not be granted where there is any doubt as to the existence of a triable issue of fact. (Rotuba Extruders v Ceppos, 46 NY2d 223.)
Here, summary judgment in plaintiffs’ favor on liability must be denied because one essential element of the fraud, the question of the plaintiffs’ reliance upon the defendant’s representations, should be tested on cross-examination by the defendant. " 'Credibility of persons having exclusive knowledge of facts should not be determined by affidavits submitted on summary judgment motions, but rather at trial by the trier of facts.’ ” (Schupak v Porsche Audi Manhattan, 150 AD2d 245, 248, citing Koen v Carl Co., 70 AD2d 695; see also, Manna v New York City Hous. Auth., 215 AD2d 335 [summary judgment denied where the accident was witnessed only by plaintiff to enable the defendant to subject plaintiff to cross-examination].)
THE CROSS MOTION TO LIMIT DAMAGES TO PECUNIARY LOSSES
Plaintiffs seek to recover damages for emotional distress. Defendant argues that since the wrongful adoption claim is a spe *57 cies of fraud, the only damages recoverable are actual pecuniary losses. Defendant analogizes a wrongful adoption claim to "wrongful life” cases, where the measure of damages is the increased cost of raising an impaired child.
Plaintiffs make three opposing arguments: (1) New York precedent supports recovery of damages for nonpecuniary loss, such as emotional distress, in fraud actions; (2) other jurisdictions recognizing the tort of wrongful adoption permit recovery of damages for emotional distress; and (3) wrongful life and wrongful adoption are not sufficiently analogous.
This court has already ruled in this case, and the Appellate Division has affirmed, that an action for wrongful adoption is a tort requiring proof of all the elements of an action for fraud. (Juman v Wise Servs., 159 Misc 2d 314, affd 211 AD2d 446, supra.) "The measure of damages in an action for deceit is firmly established. Plaintiff is entitled to indemnity for the actual pecuniary loss sustained as a direct result of the wrong.” (Hanlon v Macfadden Publs., 302 NY 502, 511.) The courts of this State have limited the damages in fraud cases to the "out of pocket” rule. (Clearview Concrete Prods. Corp. v S. Charles Gherardi, Inc., 88 AD2d 461, 467.)
Even where monetary damages have been claimed, it has long been the consistent policy of the New York courts to deny recovery in fraud based on loss of a contractual bargain where the value of the bargain is undeterminable or speculative. (Dress Shirt Sales v Hotel Martinique Assocs., 12 NY2d 339, 343 [no recovery for rejection of sublessee on false grounds by landlord where landlord had no obligation to consent to sublease].)
The damages recoverable for fraud do not include emotional distress. (Rivera v Wyckoff Hgts. Hosp., 184 AD2d 558, 561; Stich v Oakdale Dental Ctr., 120 AD2d 794.) The same rule applies in wrongful life cases. (Becker v Schwartz, 46 NY2d 401, 413-415 [pecuniary losses are recoverable, but emotional damages are too speculative]; Howard v Lecher, 42 NY2d 109; Goldstein v Ob-Gyn Assocs., 170 AD2d 374.)
The only wrongful adoption case cited by plaintiffs where emotional damages were upheld is Burr v Board of County Commrs. (23 Ohio St 3d 69, 491 NE2d 1101 [1986]). However, the holding there was not accompanied by any reasoning and this court declines to follow it. The State of Wisconsin has limited damages for wrongful adoption to pecuniary losses. (Meracle v Children’s Serv. Socy., 149 Wis 2d 19, 437 NW2d 532 [1989].)
*58 Three of the cases cited by plaintiffs in support of the claim that emotional injuries are recoverable in New York for fraud claims do not stand for that proposition. Kuelling v Lean Mfg. Co. (183 NY 78 [1905]) was an early products liability case where the cause of action was described as concealment of a product defect and the plaintiff was held to be able to recover for physical injuries. Hotaling v Leach & Co. (247 NY 84) and Mills Studio v Chenango Val. Realty Corp. (15 AD2d 138) were both fraud cases where the issue was how to calculate the plaintiff’s pecuniary loss. No emotional damages were claimed.
Only one case cited by plaintiffs arguably allowed for the recovery of emotional damages for fraud, but that case appears to be part of an early exception for fraud in inducing marriage. In Leventhal v Liberman (262 NY 209) the action was to recover damages for inducing a woman to marry a drug addict with tuberculosis by falsely stating that the man was healthy and had no bad habits. The cause of action was found by the court to support an award for humiliation, disgrace and mental anguish because the claim was a species of libel, breach of promise, seduction and criminal conversation, but, notably, not fraud. (Accord, Rosenberg v Rosenberg, 241 App Div 510 [husband could recover for humiliation and anguish resulting from being tricked into marrying a schizophrenic woman by misrepresentation of her condition].) This .court declines to extend the rule for fraudulently inducing marriage to this situation because of the more recent case law cited above that specifically rejects the recovery of emotional damages for fraud.
Finally, wrongful adoption does seem analogous to wrongful life. In both cases, the parents are faced with raising a child with defects that could have been, but were not, disclosed. However, because there is clear precedent prohibiting the recovery of emotional damages for fraud, such damages cannot be recovered in this case.
The emotional injury plaintiffs suffered while raising and losing a severely mentally ill child cannot be doubted.
However, the policy of our courts in fraud cases has always been to limit damages to those that can be measured. Therefore, despite the sympathetic appeal of plaintiffs' plight, the cross motion for summary judgment limiting the damages recoverable in this action to pecuniary losses is granted.
This is not to say that plaintiffs may not recover exemplary damages. It is for the Trial Judge to decide whether plaintiffs have established the elements necessary to recover punitive damages. Contrary to defendant’s assertion, recovery of puni *59 tive damages is not foreclosed because the defendant’s actions were not directed to the public. Defendant’s position is that its policy was not to disclose similar information to any adoptive parents at the time in question because there was a conflict of scientific opinion about the heredity of schizophrenia.
Accordingly, it is ordered that plaintiffs’ motion for summary judgment on liability is denied; and it is further ordered that defendant’s cross motion for summary judgment dismissing the complaint on the ground of the Statute of Limitations is denied and the second affirmative defense in the answer is dismissed with prejudice; and it is further ordered that defendant’s cross motion for partial summary judgment limiting the recoverable damages to pecuniary losses is granted.

 CPLR 213 (8) provides that an action for fraud must be commenced within six years, but that the time begins to run from the time the plaintiff "discovered the fraud, or could with reasonable diligence have discovered it.” CPLR 203 (g) provides that "where the time within which an action must be commenced is computed from the time when facts were discovered or from the time when facts could with reasonable diligence have been discovered, or from either of such times, the action must be commenced within two years after such actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer.”