Richard A. **WOLFORD**, and Charlene **Wolford**, Plaintiffs,

v.

The **CHILDREN'S HOME SOCIETᴌ OF WEST VIRGINIA**, Defendant.

Civ. A. No. 6:96–0814.

United States District Court, S.D. West Virginia, Parkersburg Division.

Aug. 26, 1998.

William W. Lamkin, Kenneth S. Blumenthal (Lamkin, Van Eman, Trimble, Beals & Rourke), Columbus, OH, George J. Cosenza (Cosenza & Underwood), Parkersburg, WV, for plaintiff.

Melissa R. Metzger, Kenneth E. Knopf, (Pullin, Knopf, Fowler & Flanagan), Charleston, WV, for defendant.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

The defendant in the above-styled case has filed a motion to dismiss/motion for summary

judgment. Essentially, the defendant argues that West Virginia does. not, and should not, recognize the plaintiffs' claim for "wrongful adoption." Alternatively, the defendant argues that even if the plaintiffs have stated an actionable claim, it is barred by the statute of limitations. For reasons discussed herein, the defendant's motion to dismiss/motion for summary judgment is **DENIED**.

### Factual Summary

This case arises out of the adoption of baby Jordan, a child who suffers from Fetal Alcohol Syndrome. Plaintiffs Richard and Charlene Wolford decided to adopt Jordan after a series of conversations with the defendant, Children's Home Society of West Virginia (CHS), on December 23, 1991. CHS placed Jordan in their home the very next day. Sally Fitzgerald–Noelker, a CHS caseworker, testified that she told the Wolfords at the time of placement that Jordan had been attending Shawnee Hills Early Intervention Program (Shawnee Hills) for treatment of developmental delays which CHS suspected may have been caused by the birth mother's alcohol abuse. Sally Fitzgerald–Noelker Dep. at 72–74. According to Ms. Fitzgerald–Noelker, CHS also provided the plaintiffs with documents on Jordan's medical and family history at the time of placement. Id. at 102–03. The plaintiffs, however, deny that CHS ever provided these documents or informed them of any possibility of alcohol abuse by Jordan's birth mother. Charlene Wolford Dep. at 91–94, 97–107.

Charlene Wolford testified that several months after placement, she began to notice that Jordan had unusual facial features, such as low ears and close-set eyes. Wolford Dep. at 113–14. Fearful of "chromosome abnormalities," Ms. Wolford claims that she asked CHS if it could provide any explanation for Jordan's facial features. Specifically, Ms. Wolford claims that she asked Sharon Powell, another CHS caseworker, if Jordan's birth mother used any alcohol during pregnancy. Id. at 115. According to the plaintiff, Ms. Powell assured her that to the best of her knowledge, Jordan's birth mother did not consume alcohol during pregnancy, and that his unusual facial features were merely a "familial look." Id. at 114–15.

In .May 1992, Shawnee Hills called Ms. Wolford as part of its process of closing Jordan's file to let her know that he had been treated there. Ms. Wolford testified that when she questioned Shawnee Hills as to whether Jordan had been treated for developmental delays, Shawnee Hills informed her that Jordan came to the program for a Fetal Alcohol Syndrome evaluation. Id. at 108–10. Ms. Wolford further claims that Shawnee Hills refused to provide her with any further information without a release from CHS. Id. Ms. Wolford professes that she immediately called CHS and demanded an explanation. Id. Again, Ms. Powell assured Ms. Wolford that Jordan's birth mother had not consumed alcohol during pregnancy, and that Jordan was taken to Shawnee Hills for developmental delays, not for Fetal Alcohol Syndrome. Id. at 117; Sharon Powell Dep. at 31–32. Ms.· Wolford claims that Ms. Fitzgerald–Noelker also assured her that "there was no alcohol involved" and that Shawnee Hills never diagnosed Jordan with Fetal Alcohol· Syndrome. Wolford Dep. at 124.

In fact, Shawnee Hills did complete an evaluation summary on Jordan that states on the very first page: "History of alcohol use during pregnancy." Pl. Mem. In Opp. To Def. Mot: To Dis./Mot. For Summ. J. Ex. A. The first page also notes that Sharon Powell was present for the evaluation, although she denies hearing anything about alcohol abuse during pregnancy. Powell Dep. at 17–18. In addition, Ms. Fitzgerald–Noelker testified that she personally took Jordan's birth mother to her initial intake interview at Shawnee Hills, and specifically remembers that the birth mother admitted to her that she was an alcoholic. Fitzgerald–Noelker Dep. at 66–69. According to Ms. Fitzgerald–Noelker, the birth father even told her that he had seen Jordan's birth mother get drunk at bars during her pregnancy. Id. at 29. However, both Sharon Powell and Sally Fitzgerald–Noelker testified that they had not reviewed Jordan's evaluation from Shawnee Hills prior to their phone conversations with Charlene Wolford. Powell Dep. at 30–32; Fitzgerald–Noelker Dep. at 71.

After the Wolfords finalized the adoption in June 1993, Jordan's medical problems per-

sisted. According to Mr. Wolford, they took Jordan to several specialists, including two speech therapists, a geneticist, an audiologist, and a psychiatrist. Richard Wolford Aff. ¶ 9. Although the Wolfords say they shared their suspicions that Jordan's birth mother consumed alcohol during pregnancy with these doctors, they also claim that they told the doctors that CHS had assured them that this was not the case. Mr. Wolford testified that, given this limited information, no doctor could, or did, diagnose Jordan with Fetal Alcohol Syndrome. *Id.* ¶ 10. According to the Wolfords, it was not until they received the Shawnee Hills records in September 1995, that they discovered that Jordan's birth mother had in fact consumed alcohol during pregnancy. *Id.* Thereafter, doctors did diagnose Jordan with Fetal Alcohol Syndrome. *Id.* In September 1996, the Wolfords filed suit against CHS, alleging intentional ·and negligent misrepresentation and breach of contract.

## Legal Analysis

### I. Standard of Review

The defendant moves this Court either to dismiss the plaintiffs' lawsuit based solely upon the pleadings or to grant summary judgment based upon the discovery completed to date. Pursuant to Federal Rule of Civil Procedure 12(b), the Court may consider a motion to dismiss presenting matters outside the pleadings as a Rule 56(c) motion. To resolve this motion, the Court will refer to matters outside the pleadings, and thus will treat the defendant's motion as a motion for summary judgment.

Under Rule 56(c) of the Federal Rules of Civil Procedure, to obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### II. Wrongful Adoption

The defendant first moves to dismiss the plaintiffs' lawsuit on the grounds that wrongful adoption is not an actionable claim in the State of West Virginia. Because federal jurisdiction in the instant case is predicated upon diversity of citizenship, the Court must resolve issues of substantive law by reference to West Virginia state law. However, the West Virginia state courts have never decided a wrongful adoption case. Nonetheless, this Court is confident that the West Virginia courts would recognize plaintiffs' tort claims if confronted with the facts alleged in the instant case.

As a threshold matter, I find use of the term "wrongful adoption" to be somewhat misleading. The wrong complained of in plaintiffs' lawsuit lies not in the adoption itself, but in the alleged misconduct of the defendant. It is this alleged misconduct that the plaintiffs claim infected the adoption process and caused compensable harm. Indeed, there is nothing "wrongful" about the loving act of adopting a needy child. The plaintiffs' claims are more properly characterized, if such claims should be characterized at all, as alleging a "wronged adoption." [1]

1. As the Rhode Island Supreme Court pointed out, "courts have begun to discard the term,

realizing that the question of whether to recognize causes of action for 'wrongful adoption'

## A. Tort Liability

In 1986, Ohio became the first state to extend tort principles to the adoption setting in *Burr v. Board of County Commissioners*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986). In *Burr*, the adoption agency fabricated a story about the medical and social history of a child adopted by the plaintiffs, telling the plaintiffs that the child was a "nice, big, healthy boy" born to an eighteen year old unwed mother living with her parents. *Id.* at 1103. In reality, the child was born in the state mental institution to a thirty-one year old patient diagnosed as suffering from "mild mental deficiency, idiopathic, with psychotic reactions." *Id.* at 1104. Although the birth father's identity was unknown, he was presumed to be a mental patient as well. *Id.*

Over the years, the adopted child suffered from a host of physical, mental, and psychological problems. Doctors eventually diagnosed him as suffering from Huntington's Disease, a genetically inherited disorder that destroys the central nervous system. *Id.* at 1103. Almost twenty years after placement, the plaintiffs secured a court order to unseal the child's adoption records and finally discovered his true medical and social background. *Id.* Thereafter, the plaintiffs sued the adoption agency for fraud, alleging that the agency intentionally misrepresented material facts which the plaintiffs relied upon to their detriment in deciding to adopt the child. Although it was a case of first impression, the Supreme Court of Ohio found that the agency could be held liable because the plaintiffs had proven each element of common law fraud. *Id.* at 1105–06. In justifying the extension of tort principles to the adoption setting, the court reasoned that "[a]s a public agency charged with the legal duty and authority to arrange adoptions . . . governing principles of justice . . . require that [the agency] be held accountable for injuries resulting from the deceitful and material misrepresentations which we find were

foreseeably and justifiably relied on by [the plaintiffs]." *Id.* at 1107.

In 1989, Wisconsin extended tort principles even further by recognizing negligence claims against adoption agencies in *Meracle v. Children's Service Society*, 149 Wis.2d 19, 437 N.W.2d 532 (1989). In *Meracle*, the adoption agency erroneously advised the plaintiffs that although the paternal grandfather of the child they sought to adopt had died of Huntington's Disease, the child herself was not at risk. *Id.* at 533. In fact, the child had a twenty-five percent chance of developing Huntington's Disease. Relying on the incorrect information provided by the adoption agency, the plaintiffs chose to adopt the child. The child was diagnosed with Huntington's Disease five years later. The Supreme Court of Wisconsin held that although the adoption agency had no duty to investigate and disclose the child's medical history, the agency could be held liable for negligently misrepresenting the child's risk of contracting Huntington's Disease because it voluntarily chose to provide the information. *Id.* at 537.

Many other states have also recognized fraud and negligence claims against adoption agencies based upon misrepresentation or concealment of an adopted child's medical and social history. *See, e.g., Michael J. v. County of Los Angeles*, 201 Cal.App.3d 859, 247 Cal.Rptr. 504 (1988) (recognizing adoptive parents' claim against adoption agency for intentional misrepresentation and fraudulent concealment); *Roe v. Catholic Charities*, 225 Ill.App.3d 519, 167 Ill.Dec. 713, 588 N.E.2d 354 (1992) (recognizing adoptive parents' claims against adoption agency for intentional and negligent misrepresentation); *Mohr v. ·Commonwealth*, 421 Mass. 147, 653 N.E.2d 1104 (1995) (recognizing adoptive parents' claims against adoption agency for intentional and negligent misrep-

simply requires the straightforward application and extension of well-recognized common-law actions, such as negligence and fraud, to the adoption context and not the creation of new torts." *Mallette v. Children's Friend and Serv.*, 661 A.2d 67, 69 (R.I.1995). *See also Roe v. Catholic Charities*, 225 Ill.App.3d 519, 167 Ill. Dec. 713, 716, 588 N.E.2d 354, 357 (1992)

("Recognition of [wrongful adoption] is not a dramatic, radical departure from the well-established common law . . . [i]t is rather an extension of the doctrine of common law fraud"); *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 886 (1994) (noting that "causes of action for wrongful adoption are no more than an extension of common law principles to the adoption setting").

resentation); *M.H. and J.L.H. v. Caritas Family Servs.*, 488 N.W.2d 282 (Minn.1992) (recognizing adoptive parents' claim against adoption agency for negligent misrepresentation); *Jackson v. State,* 1998 WL 111032, 956 P.2d 35 (Mont.1998) (recognizing adoptive parents' claim against adoption agency for negligent misrepresentation); *Juman v. Louise Wise Servs.*, 174 Misc.2d 49, 663 N.Y.S.2d 483 (N.Y.Sup.Ct.1997) (recognizing adoptive parents' fraud claim against adoption agency); *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882 (1994) (recognizing adoptive parents' claims against adoption agency for intentional and negligent misrepresentation); *Mallette v. Children's Friend and Serv.*, 661 A.2d 67 (R.I.1995) (recognizing adoptive parents' claim against adoption agency for negligent misrepresentation); *McKinney v. State,* 134 Wash.2d 388, 950 P.2d 461 (1998) (recognizing adoptive parents' claim against adoption agency for negligent failure to disclose statutorily mandated information). In fact, only three states have declined to recognize "wronged adoption" claims, primarily because the plaintiffs in the cases failed to prove the essential elements of common law negligence. *See Engstrom v. State,* 461 N.W.2d 309 (Iowa 1990) (agency not liable for negligence in failing to discover that birth father was still alive, and would oppose the adoption); *MacMath v. Maine Adoption Placement Servs.*, 635 A.2d 359 (Me.1993) (agency not liable for failure to disclose information where there was no evidence that agency withheld information and adoptive parents never requested information); *Foster v. Bass,* 575 So.2d 967 (Miss.1990) (agency could not have reasonably foreseen necessity of testing for PKU, an extremely rare disorder, or that doctors would fail to test child for PKU). This general trend towards recognition of common law fraud and negligence claims against adoption agencies militates in favor of finding that West Virginia state courts would likewise recognize such claims. Moreover, West Virginia state courts have already extended tort liability to recognize such novel claims as "wrongful birth" and "wrongful pregnancy." *See James G. v. Caserta,* 175 W.Va. 406, 332 S.E.2d 872 (1985). This suggests that West Virginia state courts would similarly recog-

nize the plaintiffs' tort claims here if confronted with such claims in the first instance.

However, CHS argues that exposing adoption agencies to tort or contract liability would violate public policy by burdening agencies with the unrealistic requirement of guaranteeing the future health and happiness of adopted children. When confronted with a similar argument, the California Court of Appeal explained:

> Public policy cannot extend to condone concealment or intentional misrepresentation which misleads prospective adoptive parents about the unusual calamity they are assuming. The adoption of a child is an act of compassion, love and humanitarian concern where the adoptive parent voluntarily assumes enormous legal, moral, social and financial obligations. Accordingly, a trustworthy process benefits society, as well as the child and parent. As keepers of the conscience of the community, we cannot countenance conduct which would allow persons who desire entrance into the emotional realm of parenting to be unprotected from schemes or tactics designed to discharge societal burdens onto the unsuspecting or unwary.

*Michael J.,* 247 Cal.Rptr. at 513. For the same reasons, this Court finds it extremely unlikely that West Virginia state courts would disallow fraud claims against adoption agencies on public policy grounds.

Recognition of negligence claims implicates more serious policy concerns. On the one hand, adoption agencies perform a valuable societal service, usually on a charitable basis. Unlimited tort liability for any simple oversight could drive many charities out of business. On the other hand, prospective adoptive parents have a "compelling need . . . for full disclosure of medical background information that may be known to the agency on both the child they may adopt and the child's genetic parents, not only to secure timely and appropriate medical care for the child, but also to make vital personal, health and family decisions." *M.H. and J.L.H.,* 488 N.W.2d at 287. As the Supreme Court of Rhode Island explained:

> [T]he need for accurate disclosure becomes more acute when special-needs children

are involved. Parents need to be financially and emotionally equipped to provide an atmosphere that is optimally conducive to that special child's growth and development. Although biological parents can assess the risks of having a child by investigating their own genetic backgrounds, adopting parents remain at the mercy of adoption agencies for information .... We believe extending the tort of negligent representation to the adoption context will help alleviate some of the artificial uncertainty imposed on a situation inherent with uncertainty.

*Mallette,* 661 A.2d at 73.

Here, I believe the West Virginia Supreme Court would find that the interests of adoptive parents in full and accurate disclosure outweigh any burden imposed upon adoption agencies by exposure to tort liability. To avoid liability, agencies must simply refrain from committing outright fraud and exercise ordinary care in disclosing information to prospective adopting parents. Moreover, the West Virginia Legislature has already imposed a duty of disclosure on adoption agencies in West Virginia Code § 48–4–6, which provides:

> Whenever a person delivers a child for adoption the person first receiving such child and the prospective adopting parent or parents shall be entitled to receive from such person a written recital of all known circumstances surrounding the birth, medical and family medical history of the child, and an itemization of any facts or circumstances unknown or requiring further development.

W.Va. Code § 48–4–6 (1998). It is therefore unnecessary for this Court to guess as to what public policy determinations West Virginia courts would make because the West Virginia Legislature has already made the public policy decision to impose a duty of disclosure upon adoption agencies. Moreover, West Virginia Code § 55–7–9 provides that "[a]ny person injured by the violation of any statute may recover from the offender such damages as he may sustain by reason of the violation." W.Va. Code § 55–7–9 (1994). *See, e.g., Bailey v. Black,* 183 W.Va. 74, 394 S.E.2d 58, 59 (1990) (stating that § 55–7–9

creates tort action for violation of liquor sales statute). Section 55–7–9 combines with a substantive statute to create an independent cause of action when the following four factors are shown: (1) The plaintiff must be a member of the class for whose benefit the statute was enacted; (2) consideration must be given to legislative intent, express or implied, to determine whether a private cause of action was intended; (3) the private cause of action must be consistent with the underlying purposes of the legislative scheme; and (4) the private cause of action must not intrude into an area delegated exclusively to the federal government. *Reed v. Phillips,* 192 W.Va. 392, 452 S.E.2d 708, 712 (1994) (quoting *Jenkins v. J.C. Penney Casualty Ins. Co.,* 167 W.Va. 597, 280 S.E.2d 252, 253 (1981)); *Hurley v. Allied Chem. Corp.,* 164 W.Va. 268, 262 S.E.2d 757, 758 (1980).

Here, the plaintiffs are clearly members of the class for whose benefit the statute was enacted, namely, prospective adopting parents. By enacting § 48–4–6, the West Virginia Legislature intended for full and accurate disclosure of background information concerning a child placed for adoption. Nowhere in § 48–4–6 does the legislature foreclose the possibility of using § 48–4–6 to form the basis for a private cause of action. *Cf. Reed,* 452 S.E.2d at 713 (citing language in West Virginia Code § 29–3–16 as evidence of legislature's intent not to create a duty that was actionable in tort). To the contrary, enforcement of the statutory provisions through private lawsuits comports with the underlying purposes of the legislative scheme. Finally, adoption is an area wholly within the province of state law.

■ In light of West Virginia's disclosure statute and the statute authorizing private causes of action for statutory violations, I am convinced that recognition of negligence claims against adoption agencies for misrepresentation or failure to disclose information would not offend public policy. As Justice Trieweiler of the Supreme Court of Montana explained:

> It is assumed that when the Legislature enacts statutes, or administrative agencies enact rules, they do so because of the foreseeability of harm if the statute or rule

is not followed. It is also assumed that statutes, and administrative rules which are consistent with those statutes, are a reflection of public policy .... [O]nce having determined that the [adoption agency] had a statutory duty to disclose the medical and psychological history of the adopted child's biological parents, it was unnecessary to discuss whether, under the circumstances in this case, there was also a common law duty.

*Jackson*, 956 P.2d at 53, 1998 WL 111032, at *20 (Trieweiler, J., concurring).

Finally, I would note that the West Virginia Legislature has taken no action to immunize adoption agencies from tort liability. I agree with the Supreme Court of Pennsylvania that "[t]he causes of action [for fraud and negligence] are so well established that we find affirmative action by the legislature, rather than silence, would be necessary to prevent their application in the adoption context." *Gibbs*, 647 A.2d at 889.

### B. Contract Liability

I am not confident enough, however, to predict that West Virginia courts would recognize the plaintiffs' breach of contract claim based on the facts alleged in the instant case. For one, the conduct complained of in the plaintiffs' lawsuit fits more appropriately into a tort model than a contract model. In refusing to recognize a similar breach of contract claim against an adoption agency, the Ohio Court of Appeals found that "[a] bargained-for exchange ... with respect to the life of a child is repugnant." *Allen v. Children's Servs.*, 58 Ohio App.3d 41, 567 N.E.2d 1346, 1349 (1990) (alteration in original) (quoting *A.L. and B.L. v. P.A. and M.A.*, 213 N.J.Super. 391, 517 A.2d 494, 497 (1986)). I believe that the West Virginia courts would likely share these sentiments.

### C. Application to the Facts

Having found that West Virginia state courts would recognize the plaintiffs' tort claims against CHS, I will proceed to the merits of the plaintiffs' case. The plaintiffs' first cause of action alleges that CHS fraudulently misrepresented material facts regarding alcohol abuse by Jordan's birth mother. West Virginia has long recognized common law fraud based upon intentional misrepresentation and/or concealment. *See, e.g., City Nat'l Bank v. Fidelity Mut. Life Ins. Co.*, 110 F.Supp. 510 (N.D.W.Va.), *aff'd*, 206 F.2d 531 (4th Cir.1953); *Horton v. Tyree*, 102 W.Va. 475, 135 S.E. 597 (1904). In West Virginia, the essential elements of fraud are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; (3) that the plaintiff relied upon it and was justified under the circumstances in relying upon it; and (4) that the plaintiff was damaged because he relied upon it. *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66, 69 (1981) (citing *Horton v. Tyree*, 104 W.Va. 238, 139 S.E. 737 (1927)). The plaintiff does not need to prove that the defendant actually knew the representations were false if the defendant was in a position to know, and had a duty to know, whether the representations were true or false. *Cordial v. Ernst & Young*, 199 W.Va. 119, 483 S.E.2d 248, 259 (1996).

When viewed in the light most favorable to the plaintiffs, the evidence is sufficient to state a claim for fraudulent misrepresentation. The plaintiffs have support for their claim that CHS, through its employees, intentionally misrepresented facts regarding alcohol abuse by Jordan's birth mother. The plaintiffs have made a showing that CHS's alleged statements were false. The plaintiffs have offered evidence suggesting that CHS's alleged statements that Jordan's birth mother did not consume alcohol during pregnancy were material to their decision to adopt Jordan.[2] The plaintiffs further testified that, in

---

2. For example, the plaintiffs submitted a Registration of Interest with CHS, which states that plaintiffs would not consider adopting a child with "background factors of substance abuse (drugs/alcohol)." Pl. Mem. In Opp. To Def. Mot. To Dis./Mot. For Summ. J., Ex. I. Plaintiffs also testified that they questioned CHS repeatedly about any possibility of alcohol use by Jordan's birth mother during pregnancy. Given the plain language plaintiffs used on the registration form and their repeated questions on the subject, any information about the birth mother's alcohol abuse appears to be material to the their decision to adopt Jordan.

deciding to adopt Jordan, they reasonably relied upon the assurances of CHS employees that Jordan had no medical history of substance abuse. The plaintiffs claim that their reliance upon CHS's alleged misrepresentations caused them to incur unnecessary medical expenses in their attempt to treat Jordan's medical problems without an accurate medical history, and will cause them to incur extraordinary medical expenses well into the future. Finally, CHS was in a position to know about the birth mother's alcohol abuse, particularly since Sharon Powell was present for Jordan's evaluation at Shawnee Hills, and CHS had a duty to know under West Virginia Code § 48–4–6. Therefore, the plaintiffs may establish CHS's liability for fraud without having to prove that CHS actually knew its representations were false.

The plaintiffs have also offered sufficient evidence to allow their negligent misrepresentation claim to go to trial. To state a claim for negligence, the plaintiffs must first show that "the alleged tortfeasor was under a legal duty or obligation requiring the person to conform to a certain standard of conduct." *Reed v. Phillips,* 192 W.Va. 392, 452 S.E.2d 708, 712 (1994). In *Prosser and Keeton on Torts,* the authors state:

> The standard of conduct required of a reasonable person may be prescribed by legislative enactment. When a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard for all members of the community, from which it is negligence to deviate.

W. PAGE KEETON, ET AL., PROSSER AND KEETON ON TORTS § 36, at 220 (5th ed.1984). Here, West Virginia Code § 46–4–6 imposed a duty upon CHS to fully and accurately disclose information "surrounding the birth, medical and family medical history" of baby Jordan. Whether CHS breached its duty of disclosure is a question of fact for the jury.

Although violation of a statute creates a prima facie case of negligence, the plaintiffs must also prove that the violation proximately caused their injuries. *Reed,* 452 S.E.2d at 712. Here, the plaintiffs allege that as a proximate result of CHS's alleged misrepresentations, they were deprived of the opportunity to make an informed decision whether to adopt Jordan, and thereby incurred extraordinary medical expenses in treating his Fetal Alcohol Syndrome. The plaintiffs also allege that as a result of CHS's misrepresentations, they were forced to seek answers from numerous specialists, and thereby incurred unnecessary medical expenses in their attempt to treat Jordan's medical problems without an accurate medical history. These allegations are sufficient to allow plaintiffs' negligent misrepresentation claim to go to trial. Ultimately, the determination of whether CHS's alleged misrepresentations proximately caused the plaintiffs' injuries "is within the province of the jury." *Id.*

Considering the evidence described above in the light most favorable to the plaintiffs, the Court **FINDS** that defendant CHS has failed to prove that there are no material facts in dispute and that it is entitled to judgement as a matter of law. Accordingly, summary judgment is not appropriate, and the plaintiffs are entitled to try both their fraud claim and their negligence claim to a jury.

### III. Statute of Limitations

Finally, CHS argues that the plaintiffs' claims are barred by the two year statute of limitations for fraud and personal injury claims set forth in West Virginia Code § 55–7–8a and West Virginia Code § 55–2–12. The plaintiffs did not file suit against CHS until September 4, 1996, five years after CHS first placed Jordan in their home and three years after Jordan's adoption was finalized. However, under the discovery rule, the statute of limitations does not begin to run until "the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury." *Gaither v. City Hosp., Inc.,* 199 W.Va. 706, 487 S.E.2d 901, 909 (1997).

Here, the plaintiffs claim that they did not discover conclusively that Jordan had Fetal

Alcohol Syndrome until September 1995, when they gained access to records which confirmed that Jordan's birth mother consumed alcohol during pregnancy. Furthermore, the plaintiffs claim that it was not until they reviewed these records that they were able to link CHS's misrepresentations to their injuries. The defendants counter that doctors raised the issue of Fetal Alcohol Syndrome well before September 1995. Thus, the point in time in which the plaintiffs first discovered the nature of their injury is in dispute, and determining that point in time is a question of fact. Accordingly, the Court FINDS that summary judgment is inappropriate to resolve the issue of whether the plaintiffs' lawsuit is barred by the applicable statute of limitations.

For all the reasons stated herein, the defendant's Motion to Dismiss/Motion for Summary Judgment is **DENIED**. The Court **ORDERS** that the parties submit a proposed trial schedule within 10 days of the date of this Order. The Court **DIRECTS** the Clerk to send of copy of this Order to counsel of record and any unrepresented parties.