John NIERENGARTEN and Betty Nierengarten, Plaintiffs-Appellants,

v.

LUTHERAN SOCIAL SERVICES OF WISCONSIN and Upper Michigan, Inc., and Chicago Insurance Company, Defendants-Respondents.†

Court of Appeals

*No. 96–2187. Submitted on briefs January 14, 1997.—Decided March 25, 1997.*

(Also reported in 563 N.W.2d 181.)

†Petition to review granted.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Edward F. Vlack* of *Davison & Vlack* of River Falls.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Stephen W. Hayes* and *Susan E. Lovern* of *von Briesen, Purtell & Roper, S.C.* of Milwaukee.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. John and Betty Nierengarten appeal a summary judgment dismissing their complaint against Lutheran Social Services of Wisconsin and Upper Michigan, Inc., and its insurer, Chicago Insurance Company (collectively, LSS) claiming damages for negligent misrepresentation and negligent placement of a child with their family for adoption. The Nierengartens argue that the trial court erroneously ruled that (1) they have failed to demonstrate prima facie claims for negligent misrepresentation and negligent placement; and (2) their claims were barred by the statute of limitations.

We conclude that the record discloses material issues of fact that preclude a summary judgment of dismissal of the Nierengartens' claim for negligent misrepresentation. We also conclude that LSS failed to show as a matter of law that this claim is time-barred. We reject, however, the Nierengartens' claim for negligent placement based upon a duty to investigate. We therefore affirm in part and remand for further proceedings.

## PROCEDURAL BACKGROUND AND FACTS

On June 20, 1995, the Nierengartens filed a complaint claiming that on April 24, 1987, LSS placed a child with them for adoption and that on November 3, 1987, the adoption was finalized. Since finalization, the child has been diagnosed with bipolar disorder, attention deficit/hyperactivity disorder (ADHD), post-traumatic stress disorder, and mathematics disorder. The Nierengartens alleged that LSS was negligent in the placement and, as a result, they sustained damages. They further alleged that LSS failed to provide notes from the Korean orphanage resulting in the Nierengartens' damages, and that LSS negligently misrepresented that the child was a healthy boy. The Nierengartens claim that they relied on LSS's representations and proceeded with finalization, but later learned that the boy in fact suffered from multiple disorders. The Nierengartens claimed damages for emotional distress and extraordinary medical expenses.

LSS moved to dismiss for failure to state a claim upon which relief may be granted.[1] It accompanied the motion with an affidavit of Carol Hakala, the adoption coordinator for LSS, stating that in November 1994, LSS first received handwritten notes from the Korean orphanage where the Nierengartens' son lived before his adoption. LSS "did not have knowledge of these

---

[1] A motion to dismiss for failure to state a claim admits the facts pled in the complaint and all reasonable inferences as true. *Heinritz v. Lawrence Univ.*, 194 Wis. 2d 606, 610, 535 N.W.2d 81, 83 (Ct. App. 1995). Because LSS accompanied its motion with affidavits, we interpret the motion as one for summary judgment. *See* § 802.06(2)(b), STATS.; *see also Envirologix Corp. v. City of Waukesha*, 192 Wis. 2d 277, 286-87, 531 N.W.2d 357, 362 (Ct. App. 1995).

notes at the time of the adoptee's placement with the Nierengartens." LSS attached as an exhibit the Nierengartens' July 14, 1994, letter to LSS indicating that their son was diagnosed with ADHD two and one-half years after his arrival and that the University of Minnesota recently had diagnosed bipolar disorder. The Nierengartens stated "All of these conditions [the University of Minnesota believes] were with him when he arrived in our home seven years ago."

LSS also attached as an exhibit an October 27, 1994, letter from the Eastern Child Welfare Society, Inc. It explained that the child's Korean grandmother cared for him from September 27, 1983, to December 25, 1986. The letter included notes from the Korean orphanage which were translated into English. The notes, dated January 5, 1987, to April 22, 1987, described daily activities at the orphanage.

In opposition to LSS's motion, the Nierengartens filed an affidavit of a psychologist, stating that the orphanage notes disclose behaviors symptomatic of ADHD. The child was not sleeping well, easily upset, crying, had high activity and not following through on directions. Based upon orphanage notes, it was the psychologist's opinion, to a reasonable degree of medical certainty, that the child suffered from bipolar disorder, ADHD and mathematics disorder prior to the 1987 adoption.

The Nierengartens also filed an affidavit indicating that they sought to adopt a healthy child. Their adoption agreement with LSS provided in part:

> [LSS] and Eastern Child Welfare Society will make every effort to insure that our child is healthy, and that we have as much information about his/her health/family history as possible. We understand,

however, that [LSS] does not guarantee the information provided by Eastern Child Welfare Society will be absolutely accurate.

The Nierengartens stated they received an initial social history, a health history and examination, and a pre-flight report. These documents, from the Eastern Child Welfare Society, advised that the child slept from 8 p.m. to 7 a.m., with a nap at 1 p.m., easily adjusted to new circumstances, was even-tempered, had good relationships with other children and was toilet trained. However, after placement with the Nierengartens, the child exhibited extreme tantrums lasting for hours, constant motion, slept only five hours per night, was not toilet trained, hated new places and people, acted out and bit his siblings when he did not get his way. He was very stubborn and did not cooperate with family schedules. The Nierengartens stated that LSS advised them this was normal adjustment behavior and that their child did not qualify for a special needs adoption subsidy.

The Nierengartens' affidavit states:

> The child, however, required an inordinate amount of attention and conduct was, what we thought, far more hyperactive, unfocused and uncontrolled than what we were led to believe would be normal during the adjustment period.
>
> . . . .
>
> On a number of occasions, we both wrote and personally spoke to representatives of [LSS] about the conduct we were dealing with. We were repeatedly told that this was normal adjustment behavior and things were fine. We trusted the information given to us by [LSS] and continued with the placement.

The Nierengartens state that they continued to question LSS and "we were continually reassured by [LSS] that this was normal adjustment behavior and [it] would go away." Based upon LSS assurances that this was normal adjustment behavior, the Nierengartens proceeded with the adoption's finalization in November 1987. The child's behavior did not improve, and to contain him the Nierengartens were required to install motion detectors in the house and keep knives, tools, money and other things locked up, as well as closely supervise him and their three other children. The entire family was in counseling with the child. The child was diagnosed with ADHD in kindergarten in March of 1990.

Behavior problems escalated and in the summer of 1994, the child stole a jackknife, superficially cut his forearm and threatened suicide, at which time he was hospitalized and diagnosed with bipolar disorder. As a result, the Nierengartens have incurred and expect to incur significant future medical expenses. The Nierengartens' affidavit states:

> As a result of the bipolar diagnosis, to our knowledge he will require ongoing medication management and psychotherapy, as well as medications, travel expenses, respite care, boarding school and possibly further hospitalization or residential treatment. These are extraordinary expenses that even our own health insurance will not cover. Approximately $20,000.00 of our savings was used to pay for [the child's] health care after insurance for the period of June 1994 to December 1994.

The psychologist's affidavit also states: "The condition that the child was suffering from was beyond a normal adjustment period . . . it is my opinion to a

reasonable degree of probability in the field of psychology, that this child's condition in November of 1987 was not an adjustment condition, but was bipolar disorder, ADHD, and mathematics disorder."

The Nierengartens filed this action in June 1995. The court, on LSS's motion, concluded that the injury was discovered when the child was diagnosed with ADHD in March 1990. Because the complaint was not filed until March 1995, it concluded that a three-year statute of limitations had expired. The court further found that no false statements were made. The Nierengartens appeal the summary judgment of dismissal.

## STANDARD OF REVIEW

Because LSS accompanied its motion to dismiss for failure to state a claim with affidavits and other evidentiary material, the trial court was entitled to treat the motion as one for summary judgment. *Envirologix Corp. v. City of Waukesha,* 192 Wis. 2d 277, 287, 531 N.W.2d 357, 362 (Ct. App. 1995); § 802.06(2)(b), STATS. We review a summary judgment de novo, applying the same standards as the trial court. *Brownelli v. McCaughtry,* 182 Wis. 2d 367, 372, 514 N.W.2d 48, 49 (Ct. App. 1994).

We first examine the complaint to determine whether it states a claim, and then the answer to determine whether it presents a material issue of fact. *Id.* If they do, we then examine the moving parties' affidavits and other supporting documents to determine whether that party has established a prima facie case for summary judgment. *Id.* If it has, we then review the opposing parties' affidavits and other supporting documents to determine whether there are any material

facts in dispute that would require a trial. *Id.* at 372-73, 514 N.W.2d at 49-50. All reasonable inferences are to be drawn in favor of the party opposing summary judgment. *See Williamson v. Steco Sales, Inc.,* 191 Wis. 2d 608, 624, 530 N.W.2d 412, 419 (Ct. App. 1995).

### NEGLIGENT MISREPRESENTATION CLAIM

■ The Nierengartens argue that the trial court erroneously ruled that the pleadings, affidavits and other proofs of record fail to demonstrate negligent misrepresentation. We agree. To demonstrate a claim for negligent misrepresentation, the Nierengartens must show that (1) LSS made a representation of fact; (2) the representation was untrue; (3) LSS was negligent in making the representation and (4) the Nierengartens relied on the representation to their damage. *See* WIS J I—CIVIL 2403.

In *Meracle v. Children's Serv. Soc.,* 149 Wis. 2d 19, 437 N.W.2d 532 (1989), our supreme court recognized a cause of action based upon an affirmative misrepresentation of a child's health and family history. *Meracle* involved a misrepresentation regarding a fatal genetic disorder. *Meracle* points out, however: "To avoid liability, agencies simply must refrain from making affirmative representations about a child's health." *Id.* at 32, 437 N.W.2d at 537.[2]

---

[2] Other jurisdictions that also recognize a cause of action for misrepresentation in an adoption setting include Illinois, Minnesota and Rhode Island. *See Roe v. Catholic Charities,* 588 N.E.2d 354, 361 (Ill. App. 1992); *M.H. v. Caritas Family Servs.,* 488 N.W.2d 282, 289 (Minn. 1992); *Mallette v. Children's Friend & Serv.,* 661 A.2d 67, 70 (R.I. 1995) (citing *Meracle v. Children's Serv. Soc.,* 149 Wis. 2d 19, 32, 437 N.W.2d 532, 537 (1989)).

*Meracle* discussed the nature of an injury to support a cause of action for negligent misrepresentation by an adoption agency. It concluded that the ordinary expenses of child raising are not recoverable. *Id.* at 26, 437 N.W.2d at 534-35. "It is only the extraordinary expenses, the unexpected expenses resulting from [the child's] special needs, which are actionable." *Id.* at 26, 437 N.W.2d at 535.

The Nierengartens' affidavit raises issues of material fact with respect to their negligent misrepresentation claim. The Nierengartens' claims go beyond assertions of misrepresentation concerning the child's health history. They state that after the child was placed, the child exhibited behavior that was far more uncontrolled and unfocused than expected. Despite their repeated questioning about the child's behavior, LSS assured them that it was normal adjustment behavior. Based upon these assurances, the Nierengartens continued with the placement and proceeded with finalizing the adoption. The behavior problems did not go away, but escalated until the child was ultimately hospitalized after a suicide threat and diagnosed with bipolar disorder.

██ Reasonable inferences could be drawn from the Nierengartens' affidavit to support the elements of negligent misrepresentation on the part of LSS after the child was placed. LSS's representation that the child exhibited normal adjustment could be found to be a representation of fact. The psychologist's affidavit could imply that the fact represented was untrue. A reasonable inference may be drawn that LSS was negligent in making the representation regarding the child's adjustment behavior and the Nierengartens relied upon it to their damage, incurring extraordinary

medical expenses and severe emotional distress. Reasonable inferences must be drawn in favor of the party opposing summary judgment. *Williamson,* 191 Wis. 2d at 624, 530 N.W.2d at 419.

■

We reject the Nierengartens' contention, however, that LSS made misrepresentations regarding the child's health history before placement that would form a basis for a claim of negligent misrepresentation. It is undisputed that LSS received information from the Eastern Child Welfare Society that the child was healthy. LSS relayed this information to the Nierengartens, with the provision that it did not guarantee the information received from the Eastern Child Welfare Society was accurate. The record fails to disclose that LSS made any affirmative representation about the child's health before the child was placed. Instead, LSS only transmitted information that it received from the Eastern Child Welfare Society without guaranteeing its accuracy. Nonetheless, the record demonstrates that after the child was placed with the Nierengartens, LSS made the affirmative representation that the child's conduct was normal adjustment behavior. Such representation forms the basis of the Nierengartens' claim for negligent misrepresentation.

## STATUTE OF LIMITATIONS DEFENSE

■

Next, the Nierengartens claim that the trial court erroneously concluded that their claims are barred by a three-year statute of limitations.[3] We conclude that

---

[3] The parties do not discuss the issue, but apparently agree that a three-year statute of limitations applies, § 893.54, STATS., because here, as in *Meracle v. Children's Serv. Soc.,* 149 Wis. 2d

LSS has not met its burden as the moving party to show that the Nierengartens' claims are time barred as a matter of law. A cause of action accrues when the plaintiff discovers, or should have discovered, the fact of injury and that the injury was probably caused by the defendant. *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 411, 388 N.W.2d 140, 146 (1986). A cause of action accrues at the time the diagnosis is made because at this point the plaintiffs can demonstrate with reasonable medical certainty that the child will need future medical care and incur future medical expenses. *Meracle,* 149 Wis. 2d at 29-30, 437 N.W.2d at 536.

LSS argues that the Nierengartens knew as of March 1990 that their son had ADHD. As a result, LSS argues, the Nierengartens' certainty of incurring future expenses for the child's mental disorders began five and one-half years before they filed their suit. We disagree. Only "extraordinary expenses" are actionable under *Meracle. Id.* at 26, 437 N.W.2d at 535. The record does not suggest that expenses associated with treating ADHD in an adopted child would be unexpected or extraordinary. There is no showing of any reasonable medical certainty in 1990 that the Nierengartens would incur any extraordinary medical expenses. Thus, there is no showing that the Nierengartens suffered a pecuniary injury before 1994 that would support a cause of action. *See id.* at 28, 437 N.W.2d at 535.

On summary judgment review, we must draw all favorable inferences in favor of the Nierengartens. *See Williamson,* 191 Wis. 2d at 624, 530 N.W.2d at 419. The record raises issues of material fact whether the Nierengartens should have been aware of any

19, 437 N.W.2d 532 (1989), the claims rest in part on allegations of severe emotional distress.

extraordinary expenses associated with treating their child's disorders before 1994. Consequently, we overturn the summary judgment that the statute of limitations had expired.

LSS relies on *Pritzlaff v. Archdiocese of Milwaukee,* 194 Wis. 2d 302, 320-21, 533 N.W.2d 780, 787 (1995), for the proposition that the plaintiff could have alleged a complete cause of action for civil battery by the time the tortious acts ended, and the fact that she was unaware of additional harm only created uncertainty as to the amount of damages. It did not toll the statute of limitations. *Id.* at 317, 533 N.W.2d at 786. On the record before us, *Pritzlaff* can be easily distinguished. Under *Meracle,* only extraordinary expenses are actionable. The record fails to establish as a matter of law that in 1990, when the child was diagnosed with ADHD, the Nierengartens could have alleged a complete cause of action for negligent misrepresentation involving extraordinary medical expenses. The record does not suggest that the Nierengartens knew, or should have known that the 1990 ADHD diagnosis of their adopted child would result in unexpected and extraordinary medical expenses. To the contrary, the record indicates that the extraordinary expenses were not incurred or foreseen until the bipolar diagnosis in 1994.

LSS makes several public policy arguments to the effect that the Nierengartens' liability theory is unfair and unjust, requiring agencies to be potentially "liable forever" as "guarantors of the health of the children whom they placed." Similar arguments have been addressed in *Meracle*, which held that its decision to recognize a claim for negligent misrepresentation "will not inhibit adoption. Indeed, it will give potential par-

ents more confidence in the adoption process and in the accuracy of the information they receive. Such confidence would be eroded if we were to immunize agencies from liability for false statements made during the adoption process." *Id.* at 32-33, 437 N.W.2d at 537. "We also emphasize that we do not create liability which is remote from or out of proportion to the negligence because, as we discussed above, we only allow recovery for the *extraordinary* medical expenses which will be incurred by the Meracles as a result of the negligent misrepresentation." *Id.* at 32-33, 437 N.W.2d at 537. As a result, we reverse the summary judgment of dismissal based upon the statute of limitations.

## NEGLIGENT PLACEMENT BASED UPON A DUTY TO INVESTIGATE HEALTH HISTORY

Next, we conclude that the Nierengartens failed to demonstrate a breach of an assumed duty to investigate. The Nierengartens rely on their agreement with LSS that states in part: "[LSS] and Eastern Child Welfare Society will make every effort to insure that our child is healthy, and that we have as much information about his/her health/family history as possible."

The Nierengartens argue that through this agreement, LSS assumed a duty of informing the Nierengartens about as much of the child's health history as possible. They contend that although LSS provided the pre-flight report, a health history and physical examination, and initial social history, it did not provide them with the orphanage notes prior to placement. They contend that because the orphanage

notes contradict the information in the documents provided, the failure to provide them is actionable.[4]

The Nierengartens again rely on *Meracle* that concluded the agency "voluntarily assumed the duty" of informing the prospective parents about the child's chances of developing Huntington's disease. *Meracle* observed, however: "This is not a case in which an adoption agency placed a child without discovering and informing the prospective parents about the child's health problems. Therefore we need not and do not address the question of whether adoption agencies have a duty to discover and disclose health information about children they place for adoption." *Id.* at 32, 437 N.W.2d at 537. *Meracle* therefore does not address the precise issues here, whether an adoption agency has the duty to discover health information. *Meracle* accepts the proposition, however, that an adoption agency may voluntarily assume a duty of disclosure. *Id.* at 32-33, 437 N.W.2d at 537.

We conclude, in view of the record before us, that the Nierengartens fail to demonstrate LSS breached an assumed duty to obtain the orphanage notes prior to placement. The orphanage notes do not contain a medical history or diagnosis, but record daily events at the orphanage. LSS obtained and provided the Nierengartens a social history, a health history and physical examination, and a pre-flight report. While not extensive, these reports indicated that the child was healthy.

For example, the pre-flight report, dated April 25, 1987, and signed by a social worker, states: "He understands what [is] said to him and follows direction. He spreads out 3 fingers if asked about his age. He hums

---

[4] The Nierengartens' claim is based in tort; the Nierengartens do not make any contract claim.

some words of a song. He likes toy cars best and plays with them actively. He goes up and down stairs freely. If getting angry, he runs to the corner, cries lying on the stomach or lying on the back, showing his temper, but bounces right back if soothed and loved. He is affable, attractive, cheerful and active." The physical examination report, signed by a physician, is unremarkable. The initial social history states that the child "is in good health and is normal in his general development. He is even-tempered and easily adjusts himself to new circumstances. He has a good relationship with other children."

At best, the Nierengartens' agreement implies that LSS must make a good faith effort to obtain a medical and social history. This was done. All reports indicated that the child was healthy. There was nothing in the reports to alert LSS that it needed to obtain more information, perform more extensive investigation or testing, or obtain the daily notes from the orphanage prior to placement. A duty does not exist if the defendant could not reasonably foresee any injury as a result of his acts or if his conduct was reasonable in light of what could be anticipated. *Cf. Schuster v. Altenberg*, 144 Wis. 2d 223, 236-38, 424 N.W.2d 159, 165 (1988) ("[t]he concept of duty in Wisconsin, as it relates to negligence cases, is inexorably interwoven with foreseeability.") (citation omitted). Here, there is no showing that LSS should have doubted the information it was provided prior to placement.

The Nierengartens argue a related issue that, apart from the agreement, they have demonstrated a claim for negligent placement, based upon LSS's failure to discover and disclose information about the child before he was placed for adoption. They argue that *Meracle* does not preclude a claim based upon negligent

placement. While *Meracle* does not preclude a claim based upon negligent placement, it does not recognize a claim other than misrepresentation. The Nierengartens cite no statutory or case law that recognizes a negligent placement claim based upon a breach of a duty to investigate health history.[5]

In *Gibbs v. Ernst,* 647 A.2d 882 (Pa. 1994), the Pennsylvania Supreme Court, citing *Meracle,* among other decisions, held that traditional common law causes of action grounded in fraud and negligence apply to adoption settings. *Id.* at 886. However, it held further that agencies did not have a common law or statutory duty to perform comprehensive investigations of a child's mental and physical health. It concluded that, absent a statutory directive, judicial imposition of such a duty would not be unreasonable. *Id.* at 892. We similarly find no directive in Wisconsin's statutory or common law for a comprehensive investigation of the child's health history and conclude the record does not support any claim for breach of a duty to investigate.

In conclusion, we determine that genuine issues of material fact exist whether LSS' statements, that the child was exhibiting normal adjustment behavior during its pre-adoption placement, support a claim of negligent misrepresentation. We further conclude that LSS failed to demonstrate, as a matter of law, that prior to the 1994 bipolar diagnosis, the Nierengartens discovered, or should have discovered, a reasonable medical certainty that they would incur extraordinary medical expenses as a result of the child's disorders. Finally, we conclude that the record fails to demon-

---

[5] The Nierengartens do not argue that LSS failed to comply with § 48.425, STATS., providing for a court report by an agency.

strate any basis for a negligent placement claim based upon LSS's alleged failure to investigate health history prior to placement.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded.