John NIERENGARTEN and Betty Nierengarten, Plaintiffs-Appellants-Cross Petitioners,†

v.

LUTHERAN SOCIAL SERVICES OF WISCONSIN AND UPPER MICHIGAN, INC. and Chicago Insurance Company, Defendants-Respondents-Petitioners.

Supreme Court

*No. 96–2187. Oral argument April 28, 1998.—Decided July 1, 1998.*

(Also reported in 580 N.W.2d 320.)

†Motion for reconsideration denied August 24, 1998.

For the defendants-respondents-petitioners there were briefs by *Stephen W. Hayes, Susan E. Lovern* and *von Briesen, Purtell & Roper, S.C.*, Milwaukee and oral argument by *Stephen W. Hayes.*

For the plaintiffs-appellants-cross petitioners there were briefs by *Edward F. Vlack, Charles E. Brady*, and *Davison V. Black,* River Falls and oral argument by *Charles E. Brady* and *Edward F. Vlack.*

¶ 1.  N. PATRICK CROOKS, J.  This case is on review from a published decision of the court of

appeals,[1] affirming in part and reversing in part the judgment of the circuit court, and remanding the case. The Pierce County Circuit Court, Circuit Judge Robert Wing, dismissed John and Betty Nierengarten's (Nierengartens) claims of negligent misrepresentation and negligent placement against Lutheran Social Services of Wisconsin and Upper Michigan Inc., the agency through which they adopted a child, and Lutheran Social Services' insurance company, Chicago Insurance Co. (collectively, LSS). The circuit court concluded in part that the Nierengartens' claims were barred by the expiration of the applicable statute of limitations. The court of appeals reversed that portion of the circuit court's decision dismissing the Nierengartens' claims as time-barred.

¶ 2.   Upon review, we conclude that the Nierengartens' claims are barred by the three-year statute of limitations set forth in Wis. Stat. § 893.54 (1993–94).[2] The Nierengartens' claims accrued at the time their child was diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD) on March 5, 1990. On March 5, 1990, the Nierengartens began incurring extraordinary medical expenses, i.e., those unexpected expenses arising from their child's special needs. On March 5, 1990, the Nierengartens could identify LSS as the alleged tortfeasor, and they could identify the alleged wrongful conduct. Because the Nierengartens

---

[1] *Nierengarten v. Lutheran Soc. Servs.*, 209 Wis. 2d 538, 563 N.W.2d 181 (Ct. App. 1997).

[2] Wisconsin Stat. § 893.54 states, in part:

**Injury to the person.** The following actions shall be commenced within 3 years or be barred:

 (1)   An action to recover damages for injuries to the person.

All references to the Wisconsin Statutes will be to the 1993–94 volumes unless otherwise noted.

did not file their claims until June 20, 1995, more than five years after the date on which their claims accrued, their claims are barred by the three-year statute of limitations set forth in Wis. Stat. § 893.54. Accordingly, we reverse the court of appeals and dismiss the Nierengartens' claims against LSS for negligent placement and negligent misrepresentation as time-barred.

## I.

¶ 3.    The following facts are relevant to our review. In July of 1985, the Nierengartens contacted LSS to inquire about adopting a child. The Nierengartens expressed to LSS on several occasions their desire to adopt a healthy child with no serious mental or physical handicaps. As part of the adoption process, the Nierengartens and LSS signed a Korean Adoption Program Agreement of Understanding, which states in part:

> Lutheran Social Services and Eastern Child Welfare Society will make every effort to insure that our [the Nierengartens'] child is healthy, and that we have as much information about his/her health/family history as possible. We understand, however, that Lutheran Social Services does not guarantee the information provided by Eastern Child Welfare Society will be absolutely accurate.

¶ 4.    On April 24, 1987, LSS placed a male Korean child with the Nierengartens. Prior to placement, the Nierengartens had received information from LSS regarding the child, including an initial social history, a health history and physical examination, and a pre-flight report. These documents stated in part that the child was even-tempered, follows directions, easily adjusts to new circumstances, and was healthy and

689

normal in his development. The documents further stated that the child had regular eating and sleeping habits, and that the child was toilet trained. LSS informed the Nierengartens that they were not eligible for an adoption subsidy through an adoption assistance program for children with special needs.

¶ 5.  After placement, but prior to finalization of the adoption, the Nierengartens contacted LSS because they were concerned about behavior exhibited by the child. The Nierengartens stated that the child required an inordinate amount of attention; was hyperactive, unfocused, and uncontrolled; exhibited extreme temper tantrums; did not sleep well; was not toilet trained; hated new places; had difficulty getting along with his siblings; and was stubborn and uncooperative. The Nierengartens were informed by LSS that the behavior exhibited by the child was normal adjustment behavior which would subside. On November 3, 1987, the Nierengartens finalized the adoption.

¶ 6.  The child's exceptional behavior continued, and he was subsequently diagnosed with ADHD[3] on March 5, 1990. The Nierengartens' family physician prescribed Ritalin for the child and referred the family to a psychologist for further assessment and family counseling. The Nierengartens began family counsel-

---

[3] "The essential feature of Attention-Deficit/Hyperactivity Disorder is a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequent and severe than is typically observed in individuals at a comparable level of development." American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, 78 (DSM-IV 4th ed.) Washington, DC, American Psychiatric Association, 1994.

ing with the psychologist in March, 1990. The child remained on various prescribed medications.[4]

¶ 7. On June 26, 1994, the child was admitted to the University of Minnesota Hospital and Clinic Inpatient Child and Adolescent Psychiatry Unit (UMHC) due to his attempt to commit suicide. The UMHC staff psychiatrist diagnosed the child with ADHD, Bipolar I Disorder,[5] and Mathematics Disorder.[6] The UMHC psychiatrist altered the child's prescriptions[7] and recommended in part that the child be treated by a child psychiatrist for medication management, and that he engage in individual psychotherapy in addition to the family counseling.

---

[4] The child was prescribed several medications for treatment of the Attention-Deficit/Hyperactivity Disorder including Ritalin, Cylert, and Dexedrine. The child was also eventually prescribed Anafranil to abate obsessional thoughts and compulsive behavior and improve sleep. The Nierengartens' family physician also prescribed Doral for the child to relieve psychotic-like symptoms.

[5] "The essential feature of Bipolar I Disorder is a clinical course that is characterized by the occurrence of one or more Manic Episodes. . .or Mixed [manic and depressive] Episodes. . . . Often individuals have also had one or more Major Depressive Episodes. . . ." American Psychiatric Association, at 350–51.

[6] "The essential feature of Mathematics Disorder is mathematical ability. . .that falls substantially below that expected for the individual's chronological age, measured intelligence, and age-appropriate education . . . . A number of different skills may be impaired in Mathematics Disorder, including 'linguistic' skills. . .'perceptual' skills, 'attention' skills, and 'mathematical' skills." American Psychiatric Association, at 50.

[7] The child's use of Dexedrine, Anafranil and Doral was discontinued. Wellbutrin, Prozac, and Ativan (later changed to Lithium Carbonate) were prescribed.

¶ 8. Following the multiple diagnoses at UMHC, the Nierengartens decided to apply for Supplemental Security Income and Medical Assistance. The Nierengartens wrote to LSS, requesting any additional background information regarding the child from Eastern Child Welfare Society (ECWS), including any familial history.

¶ 9. LSS contacted ECWS regarding the Nierengartens' request. In December of 1994 ECWS provided translated notes taken by a caregiver at the Korean orphanage where the child stayed prior to his placement with the Nierengartens. The child's psychologist reviewed the notes and indicated that, "to a reasonable degree of probability in the field of psychology, [the child] fit [the] definition of a special needs child prior to his adoption in 1987." Record on Appeal 24:6.

¶ 10. On June 20, 1995, the Nierengartens filed a complaint against LSS, asserting claims of negligent placement and negligent misrepresentation.[8] On April 15, 1996, LSS filed a motion to dismiss the Nierengartens' complaint.[9] LSS asserted in part that the Nierengartens had failed to state a claim for which

---

[8] The Nierengartens filed an amended complaint on August 25, 1995.

[9] As noted by the court of appeals, LSS' motion was filed as a motion to dismiss for failure to state a claim. However, because LSS attached affidavits in support of the motion, the circuit court, as well as the court of appeals, were required to treat the motion as one for summary judgment in accord with Wis. Stat. § 802.06(2)(b)(1993–94). Section 802.06(2)(b) states, in part:

> If on a motion. . .to dismiss for failure of the pleading to state a claim upon which relief can be granted. . .matters outside of the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. . . .

relief could be granted, and that the Nierengartens' claims were barred by the three-year statute of limitations set forth in Wis. Stat. § 893.54.

¶ 11. A hearing was held on LSS' motion for summary judgment on June 4, 1996, at which time the circuit court granted the motion. Citing *Meracle v. Children's Serv. Soc'y of Wisconsin*, 149 Wis. 2d 19, 437 N.W.2d 532 (1989), the circuit court concluded that the Nierengartens' claims were barred by the statute of limitations. The circuit court determined that the three-year statute of limitations set forth in Wis. Stat. § 893.54 started to run on March 5, 1990, when the child was diagnosed with ADHD, because the Nierengartens began to incur "extraordinary [medical] expenses" at that time. *Id.* at 26. Therefore, the circuit court reasoned that the Nierengartens would have had to file their claims on or before March 5, 1993. Because they did not file their claims until June 20, 1995, the action was barred.

¶ 12. Although the circuit court decided the case on a procedural issue, it also discussed the substantive issues raised by the parties. In particular, with regard to the negligent misrepresentation claim, the circuit court determined that the facts did not support the Nierengartens' claim that LSS made false statements. The circuit court expressly declined to decide the public policy issues presented by the claim of negligent placement. The Nierengartens appealed.

¶ 13. The court of appeals reversed in part and affirmed in part the circuit court judgment. The court of appeals reversed that portion of the circuit court's judgment stating that the Nierengartens' claims were time-barred. The court of appeals concluded that, in accord with *Meracle*, "only 'extraordinary expenses' are actionable." The Nierengartens' claims accrued at the

693

time the child was diagnosed with Bipolar and Mathematics Disorders, the court of appeals reasoned, because that was the time at which the Nierengartens began to incur extraordinary medical expenses. Those diagnoses occurred in June of 1994, therefore, the court of appeals concluded that the Nierengartens' claims filed in June of 1995 were not time-barred.

¶ 14. With regard to the substantive issues, the court of appeals reversed that portion of the circuit court's judgment concluding that the negligent misrepresentation claim should be dismissed. The court of appeals determined that the Nierengartens' affidavits in opposition to the motion for summary judgment raised genuine issues of material fact with regard to their negligent misrepresentation claim. The court of appeals affirmed the circuit court's dismissal of the negligent placement claim, however. It concluded that the Nierengartens' allegation that LSS failed to investigate the health history of the child did not support such a claim.

## II.

■
¶ 15. This case requires us to review the circuit court's grant of LSS' motion for summary judgment, which presents a question of law. We review motions for summary judgment de novo, using the same methodology as employed by the circuit court. *See Shannon v. Shannon*, 150 Wis. 2d 434, 441, 442 N.W.2d 25 (1989). Although we review questions of law de novo, we benefit from the analysis of both the circuit court and the court of appeals. *See Aiello v. Village of Pleasant Prairie*, 206 Wis. 2d 68, 70, 556 N.W.2d 697 (1996).

¶ 16. Wisconsin Stat. § 802.08 governs motions for summary judgment. A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2). Therefore, we must consider whether the facts presented show that LSS is entitled to summary judgment as a matter of law.

¶ 17. We first address the issue whether the Nierengartens' claims are barred by the statute of limitations. The parties agree that the three-year statute of limitations codified in Wis. Stat. § 893.54 governs the Nierengartens' claims against LSS for negligent misrepresentation and negligent placement. The parties also agree that the controlling case setting forth the time at which the Nierengartens' claims accrue is *Meracle*. Relying upon this court's decision in *Meracle*, LSS contends that the Nierengartens' claims accrued at the time the child was diagnosed with ADHD on March 5, 1990. The Nierengartens, on the other hand, argue that their claims accrued at the time the child was diagnosed with Bipolar Disorder and Mathematics Disorder in June of 1994.

¶ 18. In *Meracle*, this court addressed in part the issue whether claims filed by adoptive parents against an adoption agency for negligent placement and negligent misrepresentation were barred by the applicable statute of limitations. *See Meracle*, 149 Wis. 2d at 22. In that case, the Meracles contacted the Children's Service Society of Wisconsin (CSS) and expressed their desire to adopt a normal, healthy child without deformities or a terminal or debilitating disease.

695

¶ 19. Thereafter, the Meracles met with a CSS social worker regarding the adoption of a 23-month old child. The social worker informed the Meracles that the child's paternal grandmother had died of Huntington's Disease. However, the social worker continued to state that the child's father had previously tested negative for the disease and, therefore, the child "had no more chance of developing the disease than did any other child." *Id.* at 23.

¶ 20. Over a year after the Meracles completed the adoption of the child, Mrs. Meracle learned through a television documentary that, due to the child's familial history, their child did have a significantly increased risk of developing Huntington's Disease. Three and one-half years after this discovery, the Meracles' child was diagnosed with Huntington's Disease.

¶ 21. The Meracles subsequently filed claims against CSS for negligent placement and negligent misrepresentation, and CSS brought a motion for summary judgment. CSS argued in part that the Meracles claims were barred by the three-year statute of limitations. Quoting *Barry v. Minahan*, 127 Wis. 570, 573, 107 N.W. 488 (1906), this court stated that "[a] cause of action accrues where there exists a claim capable of present enforcement, a suable party against whom it may be enforced, and a party who has a present right to enforce it." *Meracle*, 149 Wis. 2d at 26. Similarly stated, "a cause of action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the injury was probably caused by the defendant's conduct or product." *Meracle*, 149 Wis. 2d at 25–26 (quoting *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 411, 388 N.W.2d 140 (1986)).

696

¶ 22. Relying on *Barry* and *Borello*, this court determined that the Meracles did not have an enforceable claim for pecuniary damage or emotional distress until they began to incur extraordinary expenses for their child's disease. This court reasoned that "[i]t is only the extraordinary expenses, the unexpected expenses resulting from [the child's] special needs, which are actionable." *Id.* at 26. These expenses did not arise until the Meracles' child was diagnosed with Huntington's Disease.

> [The Meracles] could not have shown with a reasonable medical certainty [at the time Ms. Meracle viewed the documentary] that they would incur any future medical expenses.
>
> . . .
>
> The Meracles did suffer an injury which could form the basis for a cause of action. . .when they learned that [their child] had developed Huntington's Disease. The Meracles had a cause of action for pecuniary damages at this time. They could then demonstrate with reasonable medical certainty that [their child] would need extensive future medical care.

*Id.* at 28–29.

¶ 23. In this case, as stated, LSS asserts that the Nierengartens' claims accrued when their child was diagnosed with ADHD, because at that time, the Nierengartens could identify LSS as the alleged tortfeasor, they could identify the alleged wrongful conduct and, significantly, they began suffering actual pecuniary damages. We agree.

¶ 24. On March 5, 1990—the day the Nierengartens' child was diagnosed with ADHD—the Nierengartens began incurring medical expenses for

prescription medications to alleviate the child's symptoms associated with ADHD. *See* Record on appeal 27:3–4. On that same day, the Nierengartens' physician referred them to a psychologist for family counseling, and recommended further individual psychological assessment for their child. *See id.* A followup appointment was also scheduled at that time. *See id.* At that point, the Nierengartens could identify LSS as the alleged tortfeasor, and could identify LSS' statements and placement of the child as the alleged wrongdoing. The medical expenses began upon the diagnosis of ADHD and were to continue indefinitely.

¶ 25.  As part of their argument, the Nierengartens assert that the costs associated with their child's ADHD do not constitute "extraordinary expenses." They state that it is "clear" that the ADHD diagnosis is not extraordinary, but that the "diagnosis of Bipolar Disorder clearly is." Cross-Pet. Response Brief at 5. They contend that the only thing extraordinary about ADHD is the "extraordinary commonness of its diagnosis and treatment." *Id.* at 6. We disagree.

¶ 26.  ADHD is recognized by the American Psychiatric Association as a mental disorder. *See* American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, 78, (DSM-IV 4th ed.) Washington, DC, American Psychiatric Association, 1994. Although the essential feature of ADHD involves a "persistent pattern of inattention and/or hyperactivity-impulsivity," *id.*, the disorder manifests itself in multiple ways.

> Other symptoms include specific learning deficits such as dyslexia; perceptual-motor deficits; defective coordination; lack of response to discipline and antisocial behavior, especially in adolescence; inter-

698

> personal relationships marred by obstinacy, stubbornness, negativism, bullying; emotional lability, low frustration tolerance; temper outburst. In addition, neurologic examination of such children often uncovers "equivocal" abnormalities, or *soft signs*, such as transient strabismus, mixed and confused laterality, speech defects, or borderline EEG record.

Psychiatric Dictionary 72 (7th ed. 1996). In diagnosing a child with ADHD, a physician, psychologist or psychiatrist must observe several criteria in addition to the presence of inattention and hyperactivity.

> Some hyperactive-impulsive or inattentive symptoms that cause impairment must have been present before age 7 years. . . . Some impairment from the symptoms must be present in at least two settings (e.g., at home and at school or work). . . . There must be clear evidence of interference with developmentally appropriate social, academic, or occupational functioning. . . . The disturbance does not occur exclusively during the course of a Pervasive Developmental Disorder, Schizophrenia, or other Psychotic Disorder and is not better accounted for by another mental disorder (e.g., a Mood Disorder, Anxiety Disorder, Dissociative Disorder, or Personality Disorder. . . .

American Psychiatric Association, at 78. *See also* Nancy Nussbaum and Erin Bigler, *Identification and Treatment of Attention Deficit Disorder*, 5–7 (1990).

¶ 27. The prevalence of ADHD is estimated at occurring in only three to five percent of the population of school-age children.[10] *See* American Psychiatric

---

[10] At oral argument, counsel for LSS also referenced statistical data indicating that only three to five percent of children are diagnosed with ADHD.

Association, at 82. The disorder creates challenges for one diagnosed with ADHD throughout childhood and adolescence, as well as into adulthood. For example, "[i]n adulthood, restlessness may lead to difficulty in participating in sedentary activities and to avoiding pastimes or occupations that provide limited opportunity for spontaneous movement." *Id.*

¶ 28. The dissent argues that the application of the statute of limitations in this case raises genuine issues of material fact and, therefore, this case cannot be decided on LSS' motion for summary judgment. The dissent urges that a determination of extraordinary expenses should take into consideration such things as the "varying degrees of severity" of the child's ADHD, as well as the "actual or estimated costs associated with treating the child's ADHD." Dissenting op. at 705–06. This court did not incorporate such factors in *Meracle*, 149 Wis. 2d at 26, when it defined extraordinary expenses as the "unexpected expenses resulting from [the child's] special needs," and we decline the invitation to consider them in this case.

¶ 29. The degree of severity of a particular child's special needs will likely vary significantly from one child to another, regardless of what those special needs are. Similarly, the exact amount of expenses related to caring for a child with special needs will likely vary. However, the varying levels of severity and total related costs associated with ADHD, for example, do not negate the fact that the child in this case had been diagnosed with ADHD—a special need that the Nierengartens did not expect when they expressed a desire to adopt a healthy child.

¶ 30. The parties do not dispute that the Nierengartens' child was diagnosed with ADHD on March 5, 1990. Upon the child's diagnosis of ADHD, the Nieren-

gartens began to incur medical expenses associated with the child's disorder. The severity of the child's ADHD and the exact amount of the expenses incurred by the Nierengartens are irrelevant under the definition of "extraordinary expenses" set forth in *Meracle*. We are not persuaded that a jury should decide whether the Nierengartens' claim should proceed based upon the degree of their child's special needs, or the fact that they may have incurred $500 in expenses or $500,000 in expenses. To do so would be inconsistent with this court's decision in *Meracle*.

██

¶ 31. In summary, we conclude that the Nierengartens' claim accrued at the time their child was diagnosed with ADHD on March 5, 1990. On March 5, 1990, the Nierengartens began incurring extraordinary medical expenses, i.e., those unexpected expenses arising from their child's special needs.[11] *See Meracle*, 149 Wis. 2d at 26. On March 5, 1990, the Nierengartens could identify LSS as the alleged tortfeasor, and they could identify the alleged wrongful conduct. Because the Nierengartens did not file their claims until June 20, 1995, more than five years after the date on which their claims accrued, their claims are barred by the three-year statute of limitations set forth in Wis. Stat. § 893.54. Accordingly, we dismiss the Nierengartens'

[11] As stated, the extraordinary medical expenses incurred by the Nierengartens for their child's special needs included expenses for prescription medications to alleviate the child's symptoms associated with ADHD, referrals to a psychologist for family counseling and further individual psychological assessment for their child, and scheduled follow-up appointments.

claims against LSS for negligent placement and negligent misrepresentation as time-barred.[12]

*By the Court.*—The decision of the court of appeals is reversed.

¶ 31a. JANINE P. GESKE, J., did not participate.

¶ 32. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE (*dissenting*). The majority opinion concludes that the statute of limitations began to run in March 1990 upon the child's diagnosis of Attention Deficit/Hyperactivity Disorder (ADHD) because at that time the Nierengartens would have incurred "extraordinary expenses, the unexpected expenses resulting from [the child's] special needs." *Meracle v. Children's Serv. Soc'y.,* 149 Wis. 2d 19, 26, 437 N.W.2d 532 (1989).

¶ 33. I conclude that in this case a court cannot determine on summary judgment whether the Nierengartens' claims were barred by the expiration of the three-year statute of limitations provided in Wis. Stat. § 893.54.[1] I would therefore affirm the decision of the court of appeals on this issue.

---

[12] Because we conclude that the Nierengartens' claims are barred by the three-year statute of limitations set forth in Wis. Stat. § 893.54, we do not decide whether their claims present genuine issues of material fact, or whether their claim of negligent placement should be dismissed as contrary to public policy.

[1] On summary judgment a court must examine the record and all reasonable inferences therefrom in the light most favorable to the nonmoving party (the Nierengartens) and determine if the moving party (Lutheran Social Services) is entitled to judgment as a matter of law. If any genuine issue of material fact exists, the case should not be decided on summary judgment and must be submitted to a fact finder.

¶ 34. To determine when a cause of action accrues, we must examine the cause of action alleged. The Nierengartens sued for negligent misrepresentation of the health of their adopted child.

¶ 35. Before the adoption the Nierengartens told Lutheran Social Services they wanted to adopt a healthy child with no serious mental or physical handicaps. After the child was placed with the Nierengartens but before the adoption was completed, the child exhibited behavioral difficulties. Lutheran Social Services reassured the Nierengartens that the child's behavior was "normal adjustment behavior" that "would go away." Based on these representations, the Nierengartens proceeded to finalize the adoption in 1987.

¶ 36. In 1990 the child was diagnosed with ADHD. From that time on he was treated with various prescribed medications for ADHD. In 1994 the University of Minnesota Hospital diagnosed the child with bipolar disorder and mathematics disorder.

¶ 37. After the child was diagnosed with bipolar disorder, the Nierengartens spent $20,000 of their savings on the child's treatment between June 1994 and December 1994. The Nierengartens allege that as a result of negligent misrepresentation by Lutheran Social Services, they are ineligible for a federal financial assistance program for adopted children with special needs. Under this assistance program, an application for financial assistance must be filed before an adoption is finalized.

¶ 38. In this case, two disputed questions of material fact exist, namely: (1) Does the diagnosis and treatment of ADHD require extraordinary expenses resulting from the child's special needs? and (2) On what date did the Nierengartens discover or in the

exercise of reasonable diligence should they have discovered that their child's disorder would result in extraordinary expenses? (Only "extraordinary expenses" are actionable under *Meracle*.)

¶ 39. The disputed issues of fact in this case must be resolved before the circuit court can determine as a matter of law whether the statute of limitations bars the Nierengartens' action. When evidence raises a factual question involving the application of a statute of limitations, the question should be submitted to a fact finder. *See Robinson v. Mount Sinai Med. Ctr.*, 137 Wis. 2d 1, 17–18, 402 N.W.2d 711 (1987).

¶ 40. According to the majority opinion's interpretation of *Meracle*, the cause of action for negligent misrepresentation did not accrue until the Nierengartens had "a compensable claim," that is, until they could demonstrate "with reasonable medical certainty" that their child "would need extensive future medical care." *Meracle*, 149 Wis. 2d at 29–30.

¶ 41. The majority opinion states that "the child in this case has been diagnosed with ADHD—a special need that the Nierengartens did not expect when they expressed a desire to adopt a healthy child." Majority op. at 701. According to the majority opinion, the Nierengartens began incurring extraordinary expenses on the day the child was diagnosed with ADHD. *See* majority op. at 689, 701–02. The majority opinion thus assumes as a matter of law that ADHD is a serious physical or mental handicap requiring significant future medical expenses.

¶ 42. I question whether this view of ADHD is correct. A more reasonable view is that ADHD has varying degrees of severity, different manifestations and symptoms, and various courses of treatment among people diagnosed with it. According to *Psychol-*

*ogy Today*, in severe cases of ADHD a person can barely function due to rampant disorganization or uncontrollable impulsivity, as well as low self-esteem or depression. However, very mild cases of ADHD can be barely noticeable, especially in bright persons who adapt well.[2] The Nierengartens themselves reported that in addition to their adopted son, they have two other children with ADHD but that these children do not present the same degree of behavioral problems as their adopted son does. According to the majority opinion, the severity of ADHD is irrelevant. *See* majority op. at 701–02.

¶ 43. Contrary to the majority opinion's conclusion that ADHD is not a common disorder,[3] many experts believe that ADHD is the United States' Number One childhood psychiatric disorder.[4] According to an estimate by the National Institute of Mental Health, approximately one student in every classroom has ADHD, which comes to more than two million children (or 3 to 5 percent).[5]

¶ 44. The majority opinion treats the diagnosis of any child with ADHD as automatically signaling the beginning of extraordinary expenses. Yet nearly half of

---

[2] Edward M. Hallowell, *What I've Learned from A.D.D.*, 30 Psychology Today 3, May 15, 1997, at 40.

[3] The majority opinion writes that the Nierengartens "contend that the only thing extraordinary about ADHD is the 'extraordinary commonness of its diagnosis and treatment.' We disagree." Majority op. at 699 (internal citation omitted).

[4] LynNell Hancock, *Mother's Little Helper (Ritalin: Miracle Cure for Attention Deficit Disorder or Overprescribed Dangerous Drug?)*, Newsweek, March 18, 1996, at 51.

[5] LynNell Hancock, *Mother's Little Helper (Ritalin: Miracle Cure for Attention Deficit Disorder or Overprescribed Dangerous Drug?)*, Newsweek, March 18, 1996, at 51.

pediatricians surveyed for a report in the Archives of Pediatric and Adolescent Medicine said they routinely send ADHD children home in an hour with a prescription.[6] The majority opinion concludes nonetheless that with respect to determining the accrual of the cause of action, the amount of expenses is irrelevant. *See* majority op. at 701–02. To the majority opinion, it does not matter whether the Nierengartens "may have incurred $500 in expenses or $500,000 in expenses." Majority op. at 701–02. Any money spent on treating the child's ADHD qualifies as "extraordinary expenses" under the majority opinion.

¶ 45.  The majority opinion is silent about the nature and extent of any extraordinary expenses arising from ADHD because the record is silent about the specific nature of the child's ADHD, as well as the projected course of his disorder and its projected treatment regimen. The record contains limited information about doctor visits and drug prescriptions, but it contains no information about actual or estimated costs associated with treating the child's ADHD.

¶ 46.  I agree with the court of appeals that the question whether the child's ADHD requires extraordinary expenses is a disputed issue of material fact that must be proved with reasonable medical certainty. I further agree with the court of appeals that the record does not support a conclusion as a matter of law that the treatment of ADHD requires extraordinary expenses:

> The record does not suggest that expenses associated with treating ADHD in an adopted child would

---

[6] LynNell Hancock, *Mother's Little Helper (Ritalin: Miracle Cure for Attention Deficit Disorder or Overprescribed Dangerous Drug?)*, Newsweek, March 18, 1996, at 51.

be unexpected or extraordinary. There is no showing of any reasonable medical certainty in 1990 that the Nierengartens would incur any extraordinary medical expenses. Thus, there is no showing that the Nierengartens suffered a pecuniary injury before 1994 that would support a cause of action.

. . .

[T]he record indicates that the extraordinary expenses were not incurred or foreseen until the bipolar diagnosis in 1994.

*Nierengarten v. Lutheran Soc. Serv.*, 209 Wis. 2d 538, 552–53, 563 N.W.2d 181 (Ct. App. 1997) (internal citations omitted).

¶ 47. Even if I were to accept as a matter of law that all children diagnosed with ADHD incur extraordinary expenses, a factual issue remains about when the Nierengartens knew or should have known that their child's ADHD would require extraordinary expenses.

¶ 48. Whether the diagnosis of ADHD results in extraordinary expenses and on what date the Nierengartens discovered or should have discovered that they would incur extraordinary expenses are predicate factual questions that must be determined by a fact finder, be it the circuit court or a jury, before the circuit court can determine as a matter of law that the statute of limitations has run. Accordingly I would affirm the decision of the court of appeals and remand the case to the circuit court.

¶ 49. For the foregoing reasons, I dissent.

¶ 50. I am authorized to state that Justice Ann Walsh Bradley joins this dissent.